NASHVILLE, C. & ST. L. RY. CO. v. McCONNELL et al. LOUISVILLE &
N. RY. CO. v. DUCKWORTH et al. WESTERN & A. RY. CO. v. SAME.[1]

(Circuit Court, M. D. Tennessee. August 19, 1897.)

1. INJUNCTION—RESTRAINING BROKERAGE IN RAILWAY TICKETS.

The managers of the Tennessee Centennial Exposition at Nashville secured
from railroads the issuance of special round-trip tickets to such Exposition
at greatly reduced rates. Such tickets were receivable for transportation
over different roads from those issuing them, but were not transfera-
ble, providing by their terms that they should be void if presented by a per-
son other than the original purchaser, and such purchaser was required to
identify himself before validating agents appointed for that purpose at the
Exposition. Defendants were ticket brokers or "scalpers" engaged at Nash-
ville in buying such tickets from the holders, and in reselling the return por-
tions to others for use in violation of the contract contained therein; giving
a guaranty of their acceptance for passage, and assisting the purchasers in
fraudulently identifying themselves as the original purchasers before the
validating agents. *Held*, that the railroad companies were entitled to injunc-
tions to restrain defendants from carrying on the business of so dealing in
such tickets.

2. SAME—MATTERS AFFECTING COURT'S DISCRETION—INJURY TO PUBLIC.

In such suits the national and state character of the Exposition, its public
importance, and the fact that its success is imperiled by the withdrawal of
such tickets from sale by some of the roads, and their threatened withdrawal
by others, in consequence of the acts of the defendants, are matters proper
to be taken into consideration as factors moving the court to some extent to
the exercise of its discretionary power to grant an injunction.

3. SAME—JURISDICTION OF FEDERAL COURT—AMOUNT IN DISPUTE.

In a suit for an injunction the amount in dispute, for jurisdictional pur-
poses, is not determined by the amount which the complainant might recover
from defendant in an action at law for the acts complained of, but by the
value of the right to be protected, or the extent of the injury to be prevented,
by the injunction.

4. SAME—PARTIES—JOINDER OF DEFENDANTS.

In a suit by a railroad company for an injunction to restrain the purchase
from passengers of partly-used tickets, nontransferable by their terms, and
their resale for use in violation of the contract contained therein, where dif-
ferent brokers are engaged in dealing in the same class of tickets they may be
joined as defendants.

5. SAME—PRINCIPLES GOVERNING THE REMEDY—NOVEL USE OF WRIT.

In the use of the writ of injunction, courts exercise a sound discretion, gov-
erned by recognized principles of equity jurisprudence and regulated by
analogy. It is not a fatal objection that the use of the writ for the particular
purpose for which it is sought is novel.

6. SAME—RESTRAINING INJURY TO BUSINESS.

The right to carry on a lawful business without obstruction is a property
right, and its protection is a proper object for the granting of an injunction,
when the ordinary remedies are inadequate.

7. SAME—SUBJECT-MATTER OF SUIT.

A suit by a railroad company to restrain ticket brokers from buying and
reselling railroad tickets to be used in violation of the contract contained
therein is not based on such contract, but the subject-matter is the illegal
use made of the tickets by defendants, not parties thereto, to the injury of
the business of the complainant; and hence any remedy provided by the con-
tract itself for its violation is not a bar to the relief sought.

8. SAME—INDUCING THE BREAKING OF CONTRACT — INTERFERENCE BY THIRD
PERSON.

One who wrongfully interferes in a contract between others, and, for the
purpose of gain to himself, induces one of the parties to break it, is liable

[1] See note at end of case.

82 F.—5

to the party injured thereby; and his continued interference may be ground for an injunction, where the injury resulting will be irreparable.

**9. SAME—IRREPARABLE INJURY.**
Where it is clearly shown that a complainant's rights are being violated, and that injury results, and the only remedy at law is by a large number of suits for damages, which, by reason of their number and cost, will produce no substantial results, the injury is irreparable, and affords ground for injunction.

**10. SAME—RESTRAINING ACT PUNISHABLE AS A CRIME.**
It is not an objection to the jurisdiction of a court of equity to grant an injunction to protect property rights that the act sought to be enjoined is also a violation of the criminal law, nor that it might properly be made the subject of criminal legislation which the legislature has not seen fit to provide.

Suits in equity by the Nashville, Chattanooga & St. Louis Railway Company against George E. McConnell and others, by the Louisville & Nashville Railway Company against W. S. Duckworth and others, and by the Western & Atlantic Railway Company against W. S. Duckworth and others. Heard on motions for preliminary injunctions on the pleadings and proofs.

W. L. Granbery, for Nashville, C. & St. L. Ry. Co. and Western & A. Ry. Co.

J. M. Dickinson and Smith & Maddin, for Louisville & N. Ry. Co.

J. H. Acklen, Pitts & Meeks, and Lellyett & Barr, for brokers.

CLARK, District Judge. A restraining order was heretofore allowed on the bills in these cases, and they are now before the court on application for preliminary injunctions upon the pleadings and proofs offered to support and oppose the motion. The cases are heard together for convenience, the proofs being treated as offered in each case, so far as applicable and competent. The remedy now sought, if granted, will constitute a new application of the injunctive process of the courts, so far as I am advised, and so far as precisely the facts of this case are concerned. I deem it therefore proper to state the case, and my views in respect thereto, with sufficient fullness that the ruling may be clearly understood.

The suits grow out of what is known as the "Tennessee Centennial and International Exposition," now being held at the city of Nashville, Tenn.; the time appointed for keeping open that Exposition being from May 1 to October 31, 1897. In order to aid in the success of this Exposition, and to widely extend its benefits to the public, the leading railroad companies of the country, after some difficulty, were induced to enter into an agreement to issue and sell during the period of said Exposition a special contract ticket, conveniently designated as the "Tennessee Centennial Ticket." This is sold as a round-trip ticket only, and at one-third of the regular price at which tickets are sold in the ordinary business of the railroads. So far as the provisions of the contract of transportation affect the matter now under consideration, it is sufficient to say that the contract between the carrier and the passenger is for a round trip, both to and from the Exposition; it being agreed that in consideration of the special reduced rate the ticket issued as evidence of the contract shall not be transferable, and shall become and be void in the hands of any third

party acquiring it in violation of the agreement. The original purchaser is required to sign this contract in the ticket issued, and is further required to identify him or her self before persons known as "validating agents," appointed for that purpose at the place of the Exposition. In short, the contract clearly and distinctly provides that all parts of the tickets shall be used only by the original purchaser, and that it shall be valid and good for transportation only in the hands of such purchaser. These provisions are very plain, and very well understood. That special ticket contracts of this kind, restricting the use thereof to the original purchaser, are valid contracts, has not been made a question in the case, and could not be, the authorities being uniform in sustaining such contracts as valid obligations. It is disclosed by the record in the cases that a considerable number of persons, known as "ticket brokers" or "ticket scalpers," are located in the city of Nashville, the place of the Exposition, and engaged in the business of buying and selling the return portion of these tickets, in violation of the contract, and it is to restrain further prosecution of this particular branch of the brokers' business that the bills in these cases are brought. Without going into elaborate detail, it is sufficient to say that it appears that all of the defendants are engaged in buying and selling these special-contract tickets. In conducting their business, many, if not most, of the defendants have persons employed for the purpose of boarding incoming trains at Nashville, and diligently working the passengers with a view to buying the return coupons of these tickets, and also for the purpose of selling, as far as may be done, to such passengers coupons for other points. It does not distinctly appear that others of the defendants go further than to conduct their business at their office, and to deal in these tickets as far as may be done by diligent work at the office directed to this class of tickets. Some of the scalpers in this business are known as "foreign brokers"; being persons who have come from other states and places to the city of Nashville for the purpose, presumably, of carrying on this business during the period of the Exposition only. The brokers permanently located at Nashville, and there when the Exposition opened, are called, for convenience, "local brokers," to distinguish them from these "foreign brokers." When these return coupons are purchased, in order to effect a sale thereof, and make them available to subsequent purchasers intending to use them in violation of the contract, it becomes necessary for the scalper or broker to agree with such persons to refund the money paid in the event the fraud is detected, and the ticket therefore cannot be used. It further becomes necessary, of course, for the person purchasing from the broker to go before the validating agents and declare that he is the same person originally purchasing and using such ticket in coming to the Exposition. It is not necessary to add, what is plainly indicated by the situation, that the person using or attempting to use the return coupon makes before the validating agent, solemnly, a deliberate misrepresentation, and practices upon the company, in the event the ticket is used, an obvious fraud. The ticket providing that it shall become void in the hands of any person other than the original purchaser, the ticket is, in law, worthless; and it is obvious

enough that the company is damaged and sustains loss to the extent of the full regular fare for the mileage over which each one of these fraudulent coupons is used. There is no process of reasoning, however strained, which can, even as a matter of form, conceal this practical fact, that the company is deliberately cheated out of the value of the regular fare of every mile of its line over which travel is made under color of one of these void papers. It is not necessary to do more than thus state the facts to show to any fair mind that this is clearly the case. It further appears from the record that the purchasers of these tickets from the brokers are carefully instructed by them as to the safest method of making a false identification, in claiming to be the original purchaser, and that in many instances the fraudulent purchaser is accompanied by the broker's agent, and aided in making effectual the imposition. The particular details as to the manner of doing this need not now be stated. In addition to this, it also appears from the mutilated ticket contracts themselves, as well as the testimony in the cases, that by means of pasting parts of different tickets together, by cutting out dates and amounts, and plugging in place thereof false dates and amounts, by taking out the signature of the original purchaser by the use of acids, and by other thoroughly objectionable methods, the most obvious frauds, not to say forgeries, are committed, in order to effectually handle these fraudulently purchased and fraudulently sold coupons. Indeed, the defendants' eminent counsel do not controvert the existence of these methods, and the subject is dismissed with the statement that there are abuses in all lines of business. It is due, just in this connection, as a part of the statement of the case, to say that not all of the defendants are actually engaged in these ruder features of doing business; and it may be justly said that, with one or two exceptions, the business of the local brokers is not conducted in these more offensive methods. It might be regarded as unkind to be more specific just here, by giving names. The fact does remain, however, that the defendants all admit squarely that they are engaged in the business of buying, selling, and causing purchasers to use, these void coupons, with the distinct knowledge and intention that they will use them; and the court finds no difficulty in affirming the existence of the further fact that they aid in accomplishing this result beyond merely buying and selling to purchasers.

The right to make and issue this special form of ticket, furnishing a reduced rate, and thereby aiding in a great public purpose such as that of an Exposition, is fully recognized both at common law and by legislation. It has often been decided by the courts that the use of one of these tickets in violation of the contract by a person other than the original purchaser is a fraud upon the common carrier. This is no longer a question. These Centennial tickets having been issued under an agreement between the railroad companies to recognize over their lines such tickets, by whatever common carrier issued, there can be no doubt that every company named in such tickets, and over whose lines these tickets call for transportation, is a party to the contract,—as much so as the initial carrier issuing the ticket,—and entitled to the full benefits and subject to the full

obligations of the contract, whatever the result of this **may be.** Whatever relief or redress, therefore, any particular common carrier concerned in one of these tickets may be entitled to at law or in equity is available to such carrier on tickets issued by other carriers as well as those issued by such particular carrier; and the damage sustained by such carrier is not confined to the tickets which it issues, but also extends to tickets to which it is a party in the sense above explained, and the damages which are resulting and may probably result to the carrier are to be estimated in this aspect of his right to protection in respect of both classes of tickets. It is not necessary, after having stated the facts at length, to say that it is perfectly apparent that practically these complainants are without any adequate redress at law for violation of these ticket contracts, and that for damages which they may sustain, if there is no remedy in equity, there is none whatever, in any just sense. Indeed, I do not understand the eminent counsel for the defendants to contend that the multitude of suits at law, in any form in which they might be technically maintained, would bring any substantial result to the complainants. On the contrary, it is perfectly apparent that it would only involve the companies in further loss, in the outlay necessary to meet large bills of cost against insolvent persons, to say nothing of other difficulties which are obvious enough. It may be reasonably supposed that one of these brokers will purchase and sell at the lowest limit 500 tickets during the Exposition, with the average loss to the carrier on each ticket of $5. If 500 separate suits at law for breach of the contract in each ticket is the only mode of redress to the carrier, it requires no comment to show that here is a striking failure of justice. The injury is obviously irreparable. It may make this point more clear if a right understanding is had of what constitutes an irreparable injury. In Wahle v. Reinbach, 76 Ill. 322, the supreme court of Illinois approved a definition of these terms in the following language:

"By 'irreparable injury' is not meant such injury as is beyond the possibility of repair, or beyond possible compensation in damages, nor necessarily great injury or great damage, but that species of injury, whether great or small, that ought not to be submitted to on the one hand or inflicted on the other; and, because it is so large on the one hand, or so small on the .other, is of such constant and frequent recurrence that no fair or reasonable redress can be had therefor in a court of law."

In Parker v. Woolen Co., 2 Black, 551, Mr. Justice Swayne, discussing the subject of interference by a court of equity on the accepted ground of a multiplicity of suits, said:

"It will also give its aid to prevent oppressive and interminable litigation, or a multiplicity of suits, or where the injury is of such a nature that it cannot be adequately compensated by damages at law, or is such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot be prevented otherwise than by an injunction. Mitf. Eq. Pl., by Jeremy, 114, 145; Jeremy, Eq. Jur. 300; 1 Dick, 163; 16 Ves. 342; Corporation of the City of New York v. Schermerhorn, 6 Johns. Ch. 46; Railroad Co. v. Artcher, 6 Paige, 83."

So, in Warren Mills v. New Orleans Seed Co., 65 Miss. 391, 4 South. 298, the facts were that complainant was in the business of buying, collecting, and crushing cotton seed, and was the owner of several

thousand sacks, all of which were legibly branded, and were necessary to be used in his business. The course of business was to distribute these sacks along the railroad and public landings, where producers, finding them, would fill them and ship them to complainant. The defendants were engaged in the same business, and were in the habit of taking complainant's sacks, and using them for their own business and for their own purposes, and sometimes concealed the use of complainant's sacks by covering them with sacks of their own. Complainant had brought numerous actions of replevin to recover possession of his sacks, in which actions the defendants had given bond. Bill was brought upon the ground that the remedies available to complainant at law were inadequate. The bill was brought for an accounting, and for an injunction against any further use of complainant's sacks by the defendants. The bill was held good on demurrer, and the judgment of the court below affirmed on appeal. The supreme court of Mississippi said:

"The separate remedy at law for each of such trespasses would not be adequate to relieve the injured party from the expense, vexation, and oppression of numerous suits against the same wrongdoer in regard to the same subject-matter. The ends of justice require, in such case, that the whole wrong shall be arrested and concluded by a single proceeding. And such relief equity affords, and thereby fulfills its appropriate mission of supplying the deficiencies of legal remedies. Affirmed and remanded, with leave to appellants to answer within thirty days after the mandate of this court herein is filed in the court below."

It seems clear to me that the cases at bar come within the definitions thus given.

In Lembeck v. Nye, 47 Ohio St. 354, 24 N. E. 690, the supreme court of Ohio, in answering the objection that there was an adequate remedy at law, said:

"The agreed statement of facts shows that the defendant Nye is insolvent, and that the financial condition of Andrews is doubtful; but, aside from this, and were they both solvent and fully able to respond to any damages that might be recovered against them in actions of trespass, yet it is apparent from the whole record that such actions would not afford an adequate remedy, for the violations of the rights of the plaintiff in error in the past and those threatened in the future were and are, during certain seasons of the year, of daily, if not of hourly, occurrence, under the claim of a right to do so; besides, the injury resulting from each separate act would be trifling, and the damages recoverable therefor scarcely equal to a tithe of the expense necessary to prosecute separate actions therefor."

What is thus said is fully applicable to the case in hand; and, to the same effect, see Boyce v. Grundy, 3 Pet. 210; Wylie v. Coxe, 15 How. 415. Indeed, as has been, in substance, said in other cases, the very fact that a right has been violated, and that this violation is constantly going on, and that a court of law cannot, in damages, compensate the injury or stop the wrong, furnishes the best possible reason for interference by court of equity; and the fact that an actual injury resulting from the violation of a right is small, and the interest to be affected by an injunction large, is not to weigh against the interposition of preventive power in equity, when it is clear that on one hand a right is violated, and on the other a wrong committed. Sanford v. Poe, 37 U. S. App. 378, 16 C. C. A. 305, and 69 Fed. 546, furnishes an illustration of the true doctrine, and an example of its practical application. Under the

scheme of taxation provided by an act of the Ohio legislature known as the "Nichols Law," the board of tax appraisers, after determining the amount of taxes, certified taxes upon the express companies to the auditors of the counties in the state,—87 in number. The express companies objected to this statute as invalid, and the question was whether that controversy might be presented and determined in one suit by injunction against the board of tax appraisers, or whether the express companies must wait until the amounts were certified to the auditors, which would give rise to a separate controversy with each county. It was held that, for the purpose of avoiding a multiplicity of suits, an injunction bill would lie against the board, if the assessments made were, for any reason, illegal. Giving the opinion of the court, Judge Lurton said:

"If the assessments complained of be illegal for any reason, the jurisdiction of a court of equity to enjoin the defendants from certifying them to the several county auditors of the state seems to be clear, upon the ground that a multiplicity of suits would result unless the assessment should be enjoined before the assessors should certify to each county auditor the proportion of the gross assessments collectible by each county auditor under the scheme of apportionment among the counties provided by the act of April 27, 1893. To require the complainants to pay each of the numerous county auditors, and then to sue to recover, or to enjoin each, would be most oppressive. We think, therefore, that the jurisdiction asserted in the bill, of avoiding a multiplicity of suits, was a sufficient ground to support the original bill, as well as the bills subsequently filed to enjoin the tax of 1894, assessed after the jurisdiction in the original case had attached. Cummings v. Bank, 101 U. S. 153, 157; State Railway Tax Cases, 92 U. S. 575; Express Co. v. Seibert, 142 U. S. 339, 348, 12 Sup. Ct. 250; Shelton v. Platt, 139 U. S. 591, 599, 11 Sup. Ct. 646; Marshall v. Holmes, 141 U. S. 589, 12 Sup. Ct. 52; Express Co. v. Poe, 61 Fed. 470."

It is not controverted, as I understand the line of argument, and could not be, I think, that the original purchaser, the ticket broker, and the subsequent purchaser who uses one of these tickets, are severally and jointly liable in an action at law to any or all of these companies in respect to a fraudulent ticket so used over the line of railway of such company or companies. If there had previously existed any doubt upon this subject, it has been put at rest by recent cases of the class to which belong the now leading case of Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240. It is said that the ground on which the liability of a third party for interfering with a contract between others was placed in that case was that the interference was malicious. It is clear, however, that the only motive for interference by the third party in that case, as well as in other cases cited, was the desire to make a profit to the injury of one of the parties to the contract. There was no malice in the case, beyond this desire to make an unlawful gain to the detriment of one of the parties to the contract; and the case, in principle, clearly controls the question of legal liability. The reasoning in the case is in other respects applicable here. It is, however, unnecessary to further pursue this point of the liability of each one of the parties to the violation of this contract in an action at law by any one of the companies injured. I think there is no doubt of such liability. The remedy at law, however, being obviously wholly inadequate, it only remains to determine whether the case is one in which a court of equity can furnish relief

against the manifest wrong; and the case, as thus presented on the equity side of this court, invoking equitable jurisdiction and equitable relief, presents a question much broader in its limits and in the measure of relief than any mere technical question of the liability in an action at law for the violation of these special-ticket contracts. It is true that the larger question and the full relief in equity depend, in a sense, upon the narrower definition of the right, and the limited form of redress at law. But this is no more than what happens in any case where the broader right and full relief in one suit in equity are being contrasted with the right and result of a multiplicity of separate suits at law. In the action at law, form is regarded, while in equity substance controls. The question, as fairly presented in these bills, is that of the protection of the business of the complainants being carried on during this Exposition in aid thereof, and in the form of these Exposition tickets. The wrong of which the complainants are complaining is not limited to the proposition that any particular one or more of these tickets has been violated, giving rise thereby to legal liability. The position here is that the business of the complainants is being seriously damaged, and will continue to be during the period of this Exposition. This loss, it is alleged, is being suffered by these complainants by repeated and continued purchases and use by these defendants of these tickets, and the question involves the entire loss which the complainants may sustain by the fraudulent use of such tickets from the beginning to the end of the Exposition. It is the protection of the whole of this form of business from the entire loss already sustained, and likely to be sustained between now and the end of the Exposition period. I repeat that it is not a question of enforcing a contract, or of recovery of damages for a breach, but it is protection of the business of the complainants from loss suffered and to be suffered by the frauds committed and likely to be committed against these companies by means of, and through the instrumentality of, these void tickets, and it is in these broader limits that the question is here considered.

A preliminary question is made on the jurisdiction of this court in respect of the amount or matter in controversy. Although this question is not first presented in argument, it must first be determined in ruling on the cases; for, if this court is without jurisdiction, it is not within its province to determine the other questions raised. The contention is that these bills are substantially suits upon the ticket contracts, to recover damages for a violation thereof, or for specific execution thereof, and that the right of action is separate upon each ticket, and that such rights or claims cannot be joined for the purpose of making up the jurisdictional amount, as against each one of the defendants, and, further, that the claims against the separate defendants cannot be joined together in this suit so as to make an amount that gives jurisdiction. It is agreed, in order to save a larger accumulation of costs, that, if the court entertains the opinion that there is jurisdiction against each defendant in a separate suit, no objection will be urged against entertaining suits against the defendants jointly. From what has been said, it will readily be seen that in my opinion these are in no just sense suits upon the contract, nor for

specific performance, but are suits to protect the business of the complainants against the irreparable mischief being suffered by reason of the fraudulent use and abuse of these ticket contracts; and the amount or value of the matter in controversy is not the damage that might be specifically recovered in a suit upon any one or more of these contracts, but is the protection furnished to the plaintiffs, and the loss prevented by the fraudulent use of any and all of these void papers. It is the value of the whole object of the suit to the complainant which determines the amount in controversy. In Railroad Co. v. Ward, 2 Black, 485, bill was brought to abate a public nuisance; and it was held that the true test of jurisdiction as to the amount was the value of the object to be gained by the bill, which object was the removal of the nuisance complained of. So, also, in Railway Co. v. Kuteman, 4 C. C. A. 508, 54 Fed. 552, the suit was by a railroad company for an injunction to restrain a shipper from prosecuting in the state courts a multiplicity of suits for overcharge in freight, the question being over the right of the company to maintain a schedule rate under which the charges were made; and the court held that the true test of the jurisdictional amount was the value of the right to maintain the rate, and not the particular sums involved in the separate suits. The exact language of the court is:

"In a suit for an injunction the amount in dispute is the value of the object to be gained by the bill. Fost. Fed. Prac. § 16. An injunction may be of much greater value to the complainant than the amount in controversy in cases of dispute which have already arisen. Symonds v. Greene, 28 Fed. 834; Whitman v. Hubbell, 30 Fed. 81. The maintenance of its rates is the real subject of dispute, and the object of the bill and the value of this object must be considered. Railroad Co. v. Ward, 2 Black, 485. This value not being liquidated or fixed by law, the alleged value, especially on demurrer to the bill, must govern."

In Smith v. Bivens, 56 Fed. 352, the bill for injunction was by the owner of a large body of land, valuable only for its pasturage rights and privileges, to protect that right from use by cattle and stock owners, neighbors of the land of complainant, under authority of an act of the legislature of South Carolina changing the previous law, which required owners of cattle and stock to keep them fenced in so as to exempt plaintiff's land, with other lands, from the operation of the act. The court held that the true test of the jurisdiction was the value of the entire pasturage right of the complainant which was to be protected, and not the amount as between the complainant and any one of the cattle owners proposing to use this right without compensation. Judge Simonton observed:

"The case comes within Railroad Co. v. Ward, 2 Black, 492; or as it is stated in Railway Co. v. Kuteman, 4 C. C. A. 503, 54 Fed. 552, in a suit for an injunction the amount in dispute is the value of the object to be gained by the bill."

After disposing of other questions, the learned judge, in answer to the objection to equity jurisdiction, said:

"With regard to the general equity jurisdiction there can be less question. By the operation of the act the complainant is exposed constantly to trespasses upon his land, and to the use and destruction of his property. Were he limited to relief at law, he would be involved constantly in a multiplicity of suits, and harassed by endless and unsatisfactory litigation. As long as the act remains of force this cannot be prevented. The owners of cattle are not required to fence

them in, and in despite of the efforts of complainant, and, we may say, even against the wishes of the cattle owners, these trespasses will go on."

In Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, the bill was filed in equity by the plaintiff against various persons claiming to act as constables of the state of South Carolina, under what was known as the "Dispensary Law." An injunction was sought to protect the alleged right of the plaintiff to import, for his use, ales, wines, and liquors, the products of other states and foreign countries. It was alleged in the bill that on several occasions packages of such wines and liquors belonging to complainant had been seized and carried away, and that complainant had instituted suits at law, and that notwithstanding such suits the constables of South Carolina continued to seize and carry away packages belonging to the complainant, and that protection of the complainant's right by actions at law involved, and would involve, a multiplicity of suits against the constables, and that the right to import wines, liquors, and other spirits was of the money value of upwards of $2,000, and also that articles to be imported in the future by the complainant from time to time were threatened to be seized by the constables, and that the value of these would exceed the sum of $2,000. A preliminary injunction was allowed. A number of defenses were set up, and among them the plea that the bill presented no cause upon which the jurisdiction of the court of equity could be founded, because there was a plain and adequate remedy at law for the injuries complained of. On final hearing the preliminary injunction was made perpetual. The case then went on appeal before the supreme court of the United States. The case made by the bill was stated by Mr. Justice Shiras, speaking for the court, as follows:

"The bill prays for an injunction on the several grounds of irreparable damage; that the acts complained of prevent the exercise by the complainant of his right to import, without molestation, lawful commodities, the products of other states; to avoid multiplicity of suits; and the want of adequate remedies at law."

There was a stipulation in the case in which it was agreed that the right of importation of ales, wines, and liquors was of the value of $2,000 and upwards, and that the difference in the price to the consumer, like the complainant, of such liquors bought out of the state dispensary of South Carolina, and bought outside of the state, was about 50 to 75 per cent. in favor of imported liquors. The court, in regard to this, said:

"Such statements sufficiently concede that the pecuniary value of plaintiff's rights in controversy exceeds the value of two thousand dollars. Nor can it be reasonably claimed that the plaintiff must postpone his application to the circuit court, as a court of equity, until his property to an amount exceeding in value two thousand dollars has been actually seized and confiscated, and when the preventive remedy by injunction would be of no avail."

This case is applicable as to jurisdiction and the new use of the writ of injunction. The loss likely to result in the future enters into the value of the object of the suit for preventive relief. Close analogy is furnished in trade-mark and patent cases. In the case of a trade-mark, it is not the label which is protected by injunction, and which is of substantial value, but it is the business carried

on under the label which is the true test of value. Nor is the mere grant of letters patent any more than proper evidence of the exclusive right to make and sell the thing protected by the letters patent. This exclusive right is the real test of value. Other cases might be cited to the same effect, but those referred to sufficiently indicate that the value of the object to be gained by these bills is the protection of the Centennial business of the plaintiffs against frauds committed and threatened with resulting loss to the plaintiffs. Such being the true view, I am of opinion that the value of the matter in controversy is sufficient to make a case of jurisdiction against each one of these defendants. All damages suffered and likely to be suffered are estimated. Indeed, the answers of some of the defendants make admissions which go far to make out a case of jurisdiction. Moreover, I think the defendants may be properly joined in one suit. Plaintiffs' business is the subject-matter in each bill, and the right claimed is exactly the same against all the defendants. The injury complained of is the same, and is being inflicted by defendants in the same method and at the same time. 1 Pom. Eq. Jur. § 274; De Forest v. Thompson, 40 Fed. 378; 2 Daniell, Ch. Prac. (6th Ed.) marg. p. 1683.

The second objection to the exercise of the injunctive process is what counsel in argument calls a "fundamental objection," based upon the fact that it is a novel application of the writ of injunction, not sanctioned by previous precedents. It is said that although the general business of the ticket broker has been suppressed by legislation in a number of states, and the interstate commerce commission has for some years urged congress to enact similar repressive legislation in respect to interstate commerce, it has never been suggested that it was within the power of the courts to furnish protection against wrongs perpetrated in this business. I have carefully considered this objection, and also the full bearing of the question, not only as affecting the private rights here involved, but as affecting the still larger public interest. It has been often judicially recognized that the use of the injunctive remedy is subject to the regulated discretion of the court, and that the court may properly take into account the public bearing of its action, and whether the result will affect the public favorably or injuriously; and the soundness of this proposition is implied in the argument of defendants' counsel, in which strenuous effort is made to show that the business of the ticket scalper is beneficial, to an extent, at least, to the public. It is perhaps just to say that this argument was directed more to sustain the general business of the broker than this particular method of doing business in regard to Centennial tickets, as brought to light in this record; for it will certainly never be seriously maintained before a tribunal or legislative body that the continuance of a fraudulent practice, thoroughly demoralizing in all its tendencies, is demanded by the public good, or what is called "public policy." It must be observed in this connection that the question now considered relates alone to the broker's method of dealing in these special Centennial Exposition tickets. I am not now concerned with the general business of the broker. Keeping this fact in mind will

serve to bring the discussion of the question, as well as its bearing, within narrower limits.

I return now to the argument based on the ground that this is a novel application of the injunction, not sanctioned by previous precedent directly in point. This argument, carried to its full logical result, would have prevented the enunciation of the first equitable principle and the establishment of the first equitable precedent for the preventive remedy. It is, indeed, an age-worn argument. It has been employed from the beginning of equity jurisprudence as a part of the objection to the extension of the equitable remedy to new conditions and new cases. This is the well-known history of the subject. Of course, this contention has been overruled, and precedent after precedent established from time to time to meet new conditions and to do full justice, until the argument has long since lost most of its force, although it is still maintained in form. It has been in answer to arguments like this that the great chancellors have stated time and again that they decline to lay down any definite rules as to when a court of equity will interpose by injunction. In fact, to do so would at once put a limit to all progress in equitable jurisprudence. The most that has been said is that in the use of the writ of injunction the court exercises sound discretion regulated by analogy; by what would be manifestly just in view of all the existing conditions, and requiring as a condition that there is no adequate remedy at law. Beyond this the courts have not gone, in the way of placing a limit on their power. It must be recognized that jurisprudence, both legal and equitable, both in respect of the right and the remedy, is progressive, that it is expansive, and that, while its great principles remain good for one time as well as another, these principles must be extended to new conditions, and this involves an extension of the remedy, and often a change in the form of the remedy. Making the injunction mandatory as well as preventive is an example of such a change. Any system of jurisprudence coming short of this would fail to meet the demands of civilization. A similar objection that novel use was being made of the writ of injunction was pressed in the case of Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 751, and was answered by the court as follows:

"Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief. Mr. Justice Brewer, sitting in the circuit court for Nebraska, said: 'I believe most thoroughly that the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand.' Mr. Justice Blatchford, speaking for the supreme court in Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, said: 'It is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public in the progress of trade and traffic by new methods of intercourse and transportation.' The spirit of these decisions has controlled this court in its action in this case."

This objection is substantially the same as was urged against the power to employ the writ of injunction in the Strike Cases, out of which arose the contempt proceeding in U. S. v. Debs, 64 Fed. 724. The objection was overruled. The jurisdiction of the court, and the rightful exercise of the power to enjoin, were affirmed in this case to the fullest extent. In re Debs, 158 U. S. 565, 15 Sup. Ct. 900. The argument of Mr. Trumbull, counsel for the defense, against the jurisdiction of the court, was based in part upon the ground that the proceeding was novel and extraordinary, and the case one over which the national government had not before, or but seldom, exercised jurisdiction, and, further, that the case was outside of the jurisdiction of a court of equity, and the injunction, therefore, void, and a violation of the same could not be punished in a contempt proceeding. It was further objected that the bill in the original case was filed in the name of the United States, which was itself new. Answering the objection that the suit was brought by the government, Mr. Justice Brewer, speaking for the court, said:

"It is said that seldom have the courts assumed jurisdiction to restrain by injunction in suits brought by the government, either state or national, obstructions to highways, either artificial or natural. This is undoubtedly true, but the reason is that the necessity for such interference has only been occasional. Ordinarily the local authorities have taken full control over the matter, and by indictment for misdemeanor, or in some kindred way, have secured the removal of the obstruction and the cessation of the nuisance."

And referring to the point made that the proceeding was extraordinary and new in the exercise of national jurisdiction, it was observed:

"Constitutional provisionals do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel; yet in its actual operation it touches and regulates transportation by modes then unknown,—the railroad train and the steamship. Just so it is with the grant to the national government of power over interstate commerce. The constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

The court, disposing of the objection that the facts constituted a criminal offense, and that the case was one proper for criminal procedure, and not within the jurisdiction of equity, said:

"Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature; but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by, or are themselves, violations of the criminal law. Thus, in Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514, an injunction to restrain the defendant from keeping a house of ill fame was sustained, the court saying on page 344, 128 N. Y., and page 515, 28 N. E.: 'That the perpetrator of the nuisance is amenable to the provisions and penalties of the criminal law is not an answer to an action against him by a private person to recover for injury sustained, and for an injunction against the continued use of his premises in such a manner.' And in Port of Mobile v.

Louisville & N. R. Co., 84 Ala. 115, 126, 4 South. 106, is a similar declaration in these words: 'The mere fact that an act is criminal does not devest the jurisdiction of equity to prevent it by injunction, if it be also a violation of property rights, and the party aggrieved has no other adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights.' "

So, in Shoe Co. v. Saxey, 131 Mo. 212, 32 S. W. 1106, the supreme court of Missouri held that a court of equity might interfere by injunction to prevent persons from attempting, by intimidation, threats, or other unlawful means, to force employés to quit work and join a strike, and that a court of equity might enjoin acts threatening irreparable injury to property rights, notwithstanding such acts were also a violation of the criminal law. Klein v. Livingston Club, 177 Pa. St. 224, 35 Atl. 606, Davis v. Zimmerman (Sup.) 36 N. Y. Supp. 303, and Elder v. Whitesides, 72 Fed. 724, are in accord.

At this point I wish to make some observations upon the condition of things that I am just now dealing with. Here is a great international exposition,—an exposition of incalculable interest and benefit to the public. It has come to be one of the greatest institutions of our time. It is a sure and successful method of wide dissemination of practical knowledge to all the people. It furnishes a ready and entertaining means whereby the citizens of the state and of the Union may learn, in the way of an object lesson, something of the progress of a great country, and its best results. It stimulates pride, and encourages large effort and the highest appreciation of one's own country. Recognizing the public interest involved in the success of the Exposition, it has received liberal appropriation by the national and state legislatures and by the counties and citizens of the state. The great public benefits are so manifest that the court of last resort in the state has judicially declared that it is a public and county purpose for which an appropriation may be made by a county, although the Exposition is to be celebrated outside of the territorial limits of the county making the appropriation. Shelby Co. v. Tennessee Centennial Exposition Co., 96 Tenn. 653, 36 S. W. 694. Judge Caldwell, speaking for the supreme court of the state, pointed out the great public advantages of the Exposition in fitting terms, as follows:

"In view of the fact that the event to be celebrated is one of no less note and importance than the birth of a great state into the American Union, and of the further fact that the Exposition is reasonably expected to attract great and favorable attention throughout the country, and be participated in and largely attended by intelligent and enterprising citizens of numerous other states, at least, it is beyond plausible debate that such an exhibition is well calculated to advance the material interests and promote the general welfare of the people of the country making it. It will excite industry, thrift, development, and worthy emulation in different avenues of commerce, agriculture, manufacture, art, and education within the county, thereby tending to the permanent betterment and prosperity of her whole people. In short, it will encourage progress, and progress will insure increased intelligence, wealth, and happiness for her people, individually and collectively. Undeniably, that which promotes such an object and facilitates such a result in any county is, to that county, a county purpose, in the truest sense."

Vast sums of money have been invested in this great public enterprise. There is involved in the success of the Exposition not only the sums of money thus put into it, but the still larger indirect bene-

fits which result in the way above referred to. It is a thing in which the citizens of the state in general, and of Davidson county and the city of Nashville in particular, take just pride. It is not to be denied that the maintenance of the favorably low rate of travel enormously increases the number of people who attend the Exposition, and thereby insures its success. It is disclosed by this record, and not controverted, that the flagrant abuses to which this special Centennial rate is being subjected, with the resulting loss to the carrier companies, have caused the withdrawal of the Centennial ticket low rate by the association of railroads known as the "Trunk-Line Association," comprising all of the leading railroads east of Washington, D. C., and that such carriers refuse to restore such rate because of the loss entailed by this business of the scalpers at Nashville. It is perfectly obvious that, if every carrier in the country should withdraw its low-rate Exposition tickets, a full justification for such course of conduct is found in the facts in this record. It is equally certain that owners of lines of railway remotely situated from the Exposition, and without the local interest which controls the management of other roads, could hardly be supposed to hold the public importance of the Exposition in sufficient appreciation to submit to the great wrong and the great loss which they are sustaining. There is good ground, therefore, for the apprehension that it is now a vital question whether the Exposition shall be the success hoped for, or whether it shall go down in defeat, with state pride humiliated, simply in order that the particular practice complained of may continue. I refer to these public considerations because, as before stated, they are matters which justly appeal to the discretion of the court in determining what action shall be taken. Are the great public purposes of this Exposition to be thus put in the balance and weighed against this particular branch of the ticket scalpers' trade? It is to be just here repeated that this particular business, in its conception and execution, is, from first to last, an obvious fraud, open and obtrusive, and without a single redeeming feature, so far as I can see. Is it to be declared that we are under a system of jurisprudence which furnishes no remedy for a purely civil wrong such as this? Are the courts of the country powerless to deal with the situation, and must they make the humiliating confession that, great as this wrong is, we have no civil remedy to which appeal may be made for protection? I am certainly unwilling to accede to a proposition such as this. It is further urged that the evil is one which can only be met by appropriate legislation,—by the enactment of a criminal statute suppressing the business through the strong arm of the criminal law. In this view I do not concur. Many acts constitute at the same time a public wrong and the invasion of a private right, and the fact that adequate punishment may be provided or may not be provided for a public wrong done is not in the way of the court furnishing redress for a civil wrong also inflicted in the same act. Indeed, this same objection was urged in the Debs Case, just as it is by defendants' eminent counsel here, and the argument was met by the court in language as follows:

"The law is full of instances in which the same act may give rise to a civil action and a criminal prosecution. An assault with intent to kill may be punished

criminally, under an indictment therefor, or will support a civil action for damages, and the same is true of all other offenses which cause injury to person or property. In such cases the jurisdiction of the civil court is invoked, not to enforce the criminal law and punish the wrongdoer, but to compensate the injured party for the damages which he or his property has suffered, and it is no defense to the civil action that the same act by the defendant exposes him also to indictment and punishment in a court of criminal jurisdiction. So here the acts of the defendants may or may not have been violations of the criminal law. If they were, that matter is for inquiry in other proceedings. The complaint made against them in this is of disobedience to an order of a civil court made for the protection of property and the security of rights. If any criminal prosecution be brought against them for the criminal offenses alleged in the bill of complaint, of derailing and wrecking engines and trains, assaulting and disabling employés of the railroad companies, it will be no defense to such prosecution that they disobeyed the orders of injunction served upon them, and have been punished for such disobedience."

The case simply calls for an application of the injunctive process to prevent complainants' business from fraud and obstruction, and a business is just as much the subject of suit, with a right to protection, as ordinary forms of tangible real and personal property. Whatever doubt may have been expressed at any time, the cases are now agreed upon this proposition. It needs no extended statement to make it manifest that the right to carry on a business without interference, without fraud, and without obstruction, is one of the most valuable of all rights. Indeed, in the commercial world the right of greatest value is the right to freely carry on a lawful business without unlawful interruption. It is a substantial right, which may be protected by any remedy known to the court as fully as a constitutional or statutory right, and as fully as a right in the ordinary forms of property. In Scott v. Donald, 165 U. S. 108, 17 Sup. Ct. 262, already referred to, it was held by the supreme court of the United States that the constitutional right of the complainant to import for his use, from time to time, ale, wines, and liquors, the products of other states, might be protected by injunction from repeated invasion by seizure of goods under color of an unconstitutional statute of the state of South Carolina. The ruling was based on the ground of avoiding a multiplicity of suits, and the want of adequate remedy at law. In Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, it was held (Mr. Justice Harlan delivering the opinion of the court) that, while a contract for personal services could not be enforced by injunction, nevertheless, when employés quitting the service of their employer combine to obstruct the business of such employer by force, threats, or other unlawful methods, such as inducing other employés to quit, and deterring others from taking the places of those leaving, such an injury might be prevented by injunction, and the right to carry on the business without molestation protected. This, too, would be a novel use of the injunction. In Davis v. Zimmerman, already referred to, it was expressly adjudged that the business of a person, if lawfully conducted, is a property right, and may be protected by injunction from injury or destruction. In a full note to the case of Arthur v. Oakes, as reported in 10 Am. Ry. & Corp. Rep. 443 (s. c., 63 Fed. 310), cases are cited in which the same principle is applied to railroads, carriers by water, manufacturers, producers, and others. All these lines of business

are protected by injunction when the ordinary remedies are inadequate. Other cases are cited at the bar, but I do not deem it necessary to further accumulate authorities upon this point. I may here make reference to the case of Lumley v. Wagner, 6 Eng. Ruling Cas. 652. A contract had been made by a lady, in writing, with the plaintiff, upon proper consideration, to sing and perform at his theater for a specified period, and that during her engagement with the plaintiff she would not sing elsewhere without his license in writing. Afterwards a contract was made to sing at a different theater during the same period specified in her engagement with the plaintiff. Upon bill by the plaintiff praying that the defendant might be restrained from singing and performing elsewhere than at his theater during the period specified, the court granted an injunction accordingly. The court, on motion to dissolve, admitted that a contract for personal services could not be directly executed, but it held that it was entirely within the power of the court to prevent by injunction a violation of the contract by singing at another theater. The court did not doubt its power to prevent her from violating her contract by singing at the other theater. This is known as negative enforcement of contract by injunction. In referring to the ground on which the court allowed the injunction, the lord chancellor said:

"Let us see for a moment what is the principle of the jurisdiction of the court. That principle is to bind men's consciences to a fair and liberal performance of their agreements. I have always thought you may attribute a great deal of the right feeling and fair dealing that exists between Englishmen to the exercise of this jurisdiction. Men are not suffered by the law of this country to depart from their contracts at their pleasure. It does not leave the party with whom the contract has been broken to the mere chance of what a jury may give in the shape of damages, where it can, but it enforces, where it can, the literal performance of the contract; and this, I believe, has mainly tended to produce the good faith that exists to a greater extent in this country than in many others. Although the jurisdiction of the court is not to be extended, a judge would desert his duty if he did not act up to the rule which predecessors have laid down as the proper exercise of a most valuable and wholesome jurisdiction. Where is the mischief in this case of exercising that jurisdiction? It is objected that, if I refuse this application, I exclude this lady from performing at Covent Garden, when I cannot compel her to perform at the Queen's Theater. I cannot compel her to perform, of course. That is a jurisdiction that the court does not possess, and it is very proper that it should not possess that jurisdiction; but what cause of complaint is it that I should prevent her from doing an act which may compel her to do what she ought to do?"

There is contained in this statement of the lord chancellor a great truth, worthy to become the subject of much thought. The fact that the "right feeling and fair dealing that exists between Englishmen" is in a large measure due to the fact that the English courts vigorously and promptly enforce the law, execute proper contracts, and restrain lawlessness, is a truth of wide application. Just as the courts of any country uphold the law and repress fraud and wrong, just to that extent will there exist "right feeling and fair dealing," confidence in the courts, and respect for lawful authority. In regard to a criminal statute, it is to be remarked that, if it existed, it could furnish no substantial redress for a civil wrong, but only for a public wrong, except such protection as might ultimately result from a total suppression of the business. It may be that in respect of a given prac-

tice a criminal enactment is desirable as a remedy for the public wrong, and to protect the public interest. This is within the legislative province. But when by the same practice a private civil injury is being done this is a subject for the judicial department, by appeal to the courts; and the courts cannot justifiably desert their duty, imposed by constitutional mandate, to administer justice. Whether or not a criminal enactment, if put upon the statute book, would be adequate to suppress the evil, would depend upon whether a criminal court should promptly and fairly avail itself of the new legislative remedy thus placed in its hands. Ours is a government of co-ordinate departments, each department exercising power constitutionally defined and limited. It cannot, compatibly with a government thus constructed, be claimed that the legislature shall be called upon to meet by criminal enactment a question of private wrong, growing out of the new conditions incident to constant changes in business relations and methods. The criminal statute could only operate prospectively, and there would be a complete failure of justice as to all past private injury, however great or shocking. Moreover, as before suggested, what remedy would the criminal law furnish for the private wrong? This question was answered by the court in Shoe Co. v. Saxey, cited above, in these words:

"Equity will not interfere when there is an adequate remedy at law. But what remedy does the law afford that would be adequate to the plaintiffs' injury? How would their damages be estimated? How compensated? The defendants' learned counsel cites us to the criminal statute. But how will that remedy the plaintiffs' injury? A criminal prosecution does not propose to remedy a private wrong. And, even if there was a statute giving a legal remedy to plaintiff, it would not oust the equity jurisdiction. The legal remedy that closes the door of a court of equity is a common-law remedy. Where equity had jurisdiction because the common law affords no adequate remedy, that jurisdiction is not affected by a statute providing a legal remedy. What a humiliating thought it would be if these defendants were really attempting to do what the amended petition charges, and what their demurrer confesses! that is, to destroy the business of these plaintiffs, and to force the eight or nine hundred men, women, boys, and girls who are earning their livings in the plaintiffs' employ to quit their work against their will; and yet there is no law in the land to protect them."

So, aside from other questions in the case, I have no difficulty about the right to employ the writ, so far as the novelty of this application is concerned, which is supposed to be a fundamental objection. Under our system of jurisprudence, the theory is that at any moment of time there is a sufficient remedy, legal or equitable, for every civil, private wrong; and the courts are under a duty, by proper process, to make this theory good in fact.

Another point made is that this special-ticket contract, providing as it does for forfeiture of all rights under the ticket by transfer thereof, has in that way provided a remedy for a breach of such contract, and that this is exclusive of all other forms of relief. It is sufficient to repeat what has already been said, to wit, that these are suits to protect the plaintiffs' business, and in no sense suits upon these ticket contracts, to enforce the same, or to recover damages for breach thereof. These suits are to restrain these defendants from the continued and repeated use of these contracts as instruments and means whereby to commit frauds upon complainants' business. They are

not suits between the parties to these contracts, but against third parties, to restrain the fraudulent use of the contracts as means of committing such wrong.     This contention is therefore inapplicable, and this question does not call for judgment by the court.     The defendants' counsel, not as a separate point, but in aid of other objections to the relief asked, says that the ticket broker's business is, to an extent, at least, beneficial to the public, and, to an extent, contributes to the success of the Exposition.     It was not made entirely clear to the court whether this suggestion related to the general business of the ticket broker, or to that particular business which is now under examination, but the illustration put may speak for itself in this respect. It is said that a person at Chicago, desiring to go East, but not specially intending to come to the Exposition, may be induced to do so if he can buy a low-rate Centennial ticket from Chicago to Nashville and return, and, coming by way of Nashville, sell to the broker the return coupon, and buy at a like cheap rate the return coupon on an Eastern-sold ticket, and in this way go to New York on a low rate, taking in the Exposition on the way.     Whether it is best that all of the parties to such a transaction, as a matter of public policy, should be thus permitted to violate a contract and practice an imposition is a question which may be safely left for answer before those who are thoughtful of the deeper consequences involved.     It is further evident, in the very nature of the case, that, where one person visits the Exposition in this manner and under such circumstances, hundreds attend for the sole purpose of the Exposition and its benefits; and the number of those who may be induced to come to the Exposition in the way suggested is as one to hundreds, and is relatively wholly insignificant in its importance to the question of much larger importance, of maintaining open to all persons this favorably low-rate ticket designed to promote the success of the Exposition.     The use of these tickets in the method hereinbefore pointed out is demoralizing, and subversive of public good and of public morals, and at the same time a private, civil injury; and this, I think, is made sufficiently plain by what has been said.     Just before passing away from this point, it may not be inappropriate, in view of the suggestion made, to remark that the question of whether the ticket scalpers' business is one of public good is not a new question, and the view I take of this particular branch which is now under consideration is by no means a new view of the same subject.     The highest authorities in the country, both legislative and judicial, have examined this business, and have pronounced judgment upon it.     The Interstate Commerce Commission, in its annual report for 1896, after a study of the subject extending over some years, referred to ticket brokerage in terms as follows:

"In our last annual report we took occasion to comment with some severity upon the unlawful practices of a considerable class of persons who engage in the unauthorized sale of interstate passenger tickets, and who are commonly referred to by the expressive name of 'scalpers.' What was then said is, in part, as follows: We deem it a special duty to call your attention to the persistent survival and continued increase of the illegitimate business known as 'ticket brokerage' or 'scalping.' So far from showing any signs of diminution, it appears to be steadily enlarging in scope and volume. It is impossible to give any reliable estimate of the number of persons who take advantage of this means of procuring

unlawful transportation, but it is evident that a considerable percentage of railroad passenger travel is accomplished through the medium of tickets bought at reduced rates of so-called 'brokers.' In every city, and in many of the smaller towns, offices are to be found whose proprietors sell railroad tickets to very many points at much less than the published tariffs. The streets are placarded with alluring advertisements, incoming and outgoing travelers are openly solicited, while in hotels and other public places, and not infrequently in regular railroad stations, the runners and agents of these clandestine dealers invoke participation in transportation bargains, which upon their face, to give them no harsher term, are an obvious evasion of the law. This disregard of law to which we thus referred has apparently continued during the current year, and assumed still greater and more serious proportions. This illegitimate traffic has become a positive scandal, and decisive measures should be taken to put an end to these illegal transactions. The remedy for this evil is easily found. A simple enactment would be sufficient, in our judgment, to prevent these abuses and effectually check this species of misconduct. We therefore recommend that it be made a penal offense for any person to engage in the business of selling interstate passenger tickets unless he is an authorized agent of the carrier, duly constituted such by written appointment, and that every such person be required, under appropriate penalty, to expose in his place of business a certificate of his authority. We also call attention to the fact that extensive frauds upon the public are accomplished by the printing and sale of counterfeit tickets. It has come to our knowledge that hundreds of innocent persons have been victimized by the purchase of spurious tickets from those whose identity could not be clearly established after the fraud was discovered. The actual money loss thus resulting to unsuspecting travelers amounts to a considerable sum, while the distress and annoyance to which innocent persons have been subjected because they have been induced to purchase these sham tickets can be easier imagined than described. It is a defect in the federal statutes that the counterfeiting of railroad tickets is not made a criminal offense, and we earnestly recommend the correction of this defect by an appropriate enactment."

In 1890 the commissioner had said, in part:

"The business is therefore hurtful both to the roads and to the public, in a financial sense, and the extent of the injury it is scarcely possibly to measure. The harm done by an army of unscrupulous depredators upon a legitimate business cannot be computed by any known standard. Lawless greed recognizes no limits, and weak compliance by its victims only stops at exhaustion. But the moral injury both to railroad officials and to the public is even greater. To railroad officials the business serves as an invitation and an excuse for dishonest practices. It is used as a cover—deceitful and transparent, it is true—for evasions of law, and for dishonorable violations of compacts among competing roads to maintain agreed schedules of rates. The public morals are affected by the natural inference that railroad officials are deficient in sense of honor and integrity, and that, if the railroad code of ethics permits one road to cheat another, it is equally permissible for the public to cheat the railroads. The inevitable tendency of the practice, therefore, is to eliminate the moral element, and the rule of action that element inculcates,—business honor,—from the practical field of transportation. In whatever aspect ticket scalping may be viewed, it is fraudulent alike in its conception and in its operation. The competition of roads affords the opportunity for the work of the scalper. Without rival roads competing for business, he could have no field. The prospect of selling more transportation at a discount than at the established rate, and so diverting business dishonestly from a competitor, is the temptation to a road to let a scalper do for it secretly what it does not dare do openly. The weak excuse of every road that transgresses in this manner is that some competitor does it. Fraud, therefore, is the incentive to the business, and in its conduct every step is one of actual fraud. The scalper's vocation, the necessity for his occupation, is to sell transportation at less than published and established rates; in other words, below lawful charges. Every such sale is a fraud upon the law, a fraud upon competing roads, and a fraud upon the stockholders and the creditors of the road for which sale is made."

In addition to this, a number of the states of the Union—among them leading states, like Illinois, Texas, New York, and Pennsylvania

—have enacted legislation suppressing the ticket brokerage business, and this legislation has been upheld by the courts of last resort, as justified by the exercise of the police power of the state. In Minnesota v. Corbett, 57 Minn. 345, 59 N. W. 317, the supreme court of Minnesota held such legislation valid; and in the progress of the opinion, referring to the scalpers' business, the court said:

"With these elementary propositions in mind, we proceed to consider the evils, or supposed evils, which the legislature designed to remedy, and the measures which they have adopted to accomplish that end. It was commonly asserted and believed (to what extent correctly is not important) that spurious and stolen tickets, and tickets which had expired by limitation, or that were not transferable, were often put on the market to such an extent as to work great frauds upon both the public and the carriers; that frequently those selling such tickets were irresponsible, so that the party defrauded had no redress; that the business of trafficking in such tickets often furnished an inducement to railway employés to steal tickets, or issue spurious ones, and put them on the market. It was also commonly believed that, in order to evade statutes designed to secure uniformity of rates and to prevent discriminations, some carriers of passengers were in the habit of placing large blocks of their tickets with 'scalpers,' ostensibly not their agents, for sale at cut rates. To remedy these and similar abuses, real or supposed, this statute was passed. That all its provisions have some relation to, and tendency to accomplish, this end, is quite clear. Do they transcend any constitutional limitation upon legislative power? It seems to us that most of the objections to the act—certainly the first two—are based upon a radical misconception of its provisions, and of the character of transportation tickets as property. Counsel for the defendant seems to assume—First, that such tickets are vendible chattel property, which are the legitimate subject of barter and sale, the same as any other chattels; and, second, that this statute is designed to be a 'license law,' in the ordinary sense of that term. With these two premises assumed, the task of successfully assailing the validity of the act is a very easy one. While a railroad ticket is, in one sense, property, yet it is not merchandise or chattel. It is merely the evidence of the contract of the carrier to transport the holder between the points, and on the condition, therein named. Treating it as a contract itself, it is in the nature of a chose in action. No one with whom a carrier makes such a contract has any inherent constitutional right to insist that it should be assignable. At common law, all choses in action were nonassignable, and if the legislature had deemed it necessary, in order to prevent the supposed evils, to provide that all transportation tickets should be nontransferable, or even to prohibit the issue of tickets altogether, and require carriers of passengers to collect fare in cash, we fail to see why they had not the power to do so."

If the contention that ticket brokerage is beneficial to the public in any sense can be made good, it is necessary to discredit this legislation and the opinions of these great tribunals. That such legislation was enacted, and the judgment of the courts pronounced, only after the most thorough examination and study of the subject, will readily be conceded. Whatever future investigation or study of the subject may disclose as to the ordinary business of the ticket scalper, and whatever may be the final word in any state as to such business, it is certain that methods of the kind which form the subject of the present suit can never be justified from any standpoint of public or private good; and if by such methods the entire business, in all of its branches, is brought into such disrepute as to demand total suppression, it will only make manifest the repetition of history in the end which has come to all such practices.

Another defense urged is that these companies have not themselves adopted proper methods of business whereby to protect themselves against this imposition, and that they are practically not entitled to

relief at the hands of the court of equity. I quite fully agree with counsel that the plaintiffs asking protection of the court of equity must have adopted in good faith, and executed, all proper measures to protect themselves before invoking the power of the court, and I was much impressed with this view when presented at the bar with much power. It is said that the complainant companies have been guilty of discrimination with respect to the public, by issuing an open ticket and an ironclad ticket, without any sufficient reason for the distinction. The ironclad ticket is the one which is required to be signed by the purchaser, and contains stipulations against transfer or use by any other person, while the open ticket is issued in a similar form, and at the same rate, but without the signature, and without provision against transfer. Upon examination it appears that the companies have what they call a "zone" or "radius" of, say, 80 to 100 miles around the city of Nashville, and that within this zone the open Centennial tickets are issued and sold, while beyond the zone limit ironclad tickets only are used. So, too, it does appear that in some instances at the same point both forms of ticket have been sold, and that at particular places, like Jackson, Tenn., and Birmingham, Ala., the ironclad ticket only is sold, while open tickets are put in evidence as having been sold on either side of these places. So far as the zone limit is concerned, I must say that I do not consider the reason offered for establishing such a limit as very satisfactory. Whether this is because the business requires expert knowledge, I do not know, but I fail to see any good reason for this. Be this as it may, the public have made no complaint on this score, and I do not think it is open to these defendants to say, in opposition to the relief, that they should be allowed to continue the injury inflicted on these complainants, and also, it would seem, upon the public, upon the ground that the companies have established this limit arbitrarily. So far as the other irregularities presented are concerned, I find, after an examination of these, that they are extremely few and unimportant, when compared with the whole volume of business transacted in regard to these tickets. By an order in effect June 10, 1897, most of the irregularities were corrected. The Western & Atlantic Railway Company is comparatively free from any irregularity whatever. The Nashville, Chattanooga & St. Louis Railway Company has allowed but few, and the chief of these was due to the fact that an unsuspecting agent was imposed on by the grossest form of misrepresentation by a ticket broker. There are some circumstances in the record to support the belief, and create strong suspicion, that since the institution of these suits a considerable number of the irregularities presented have been brought about at the suggestion of these defendants, by misleading unsuspecting agents, for the purpose of using the irregularities in these suits. The greater number of the failures to have the tickets properly signed and witnessed on the Louisville & Nashville Road may be due to the larger volume of business transacted, and the greater number of employés in its service. In the nature of the case, these large concerns, employing as they do so many persons, cannot at any given time have in their service employés all of whom are sufficiently intelligent and watchful. I am unable to say, even if the objection

were one coming from a proper source, that the defaults on the part of the companies have been such as to deprive them of relief, so far as this ground of objection is concerned.

I have now disposed of all of the grounds of objection urged by the defense. In doing so I have given to the subject that careful study demanded by its importance, and by the earnest ability with which the objections to the bills have been pressed. The use of the writ of injunction is a serious, delicate duty, in any case. It is a striking manifestation of the strong arm of civil authority. My conclusion is that the plaintiffs are entitled to an injunction as prayed for in these bills, upon the execution in each case of bond in the sum of $20,000, to be approved by the clerk of the court, with the usual conditions required by law,—among them, to satisfy and pay all such damages as defendants may sustain by reason of the wrongful suing out of the injunction, in the event the suits shall not be successfully prosecuted. If this amount is not deemed adequate, the defendants are at liberty at any time to ask that the bonds be increased. It may serve to clear up the situation to particularly point out that the injunction now allowed is operative against defendants only in respect to the Centennial low-rate tickets duly signed by the original purchaser in ink, and not in pencil, and not by initial; but, within these limits, it may be well if this injunction is obeyed without indirection. It may further conduce to a clear understanding to say that according to the cases Ex parte Lennon, 12 C. C. A. 134, 64 Fed. 320, and In re Lennon, 166 U. S. 548, 17 Sup. Ct. 658, persons who have knowledge of this injunction are rendered amenable thereto, although not parties to this suit; and it may be well if this fact is kept in mind. It is apparent enough, without being repeated, that the general business of the ticket scalpers is not here in question, and is not interrupted or interfered with by this injunction. It is only the scalpers' practice of dealing in the particular Centennial tickets when duly signed and executed in the manner suggested above.

## NOTE BY THE JUDGE.

That tickets with conditions and restrictions like those contained in the Centennial ticket are valid and binding on the purchaser has been often decided. Among many cases, Mosher v. Railway Co., 127 U. S. 390, 8 Sup. Ct. 1324, Boylan v. Railroad Co. 132 U. S. 146, 10 Sup. Ct. 50, Drummond v. Southern Pac. Co., 7 Utah, 118, 25 Pac. 733, and Cody v. Railroad Co., 4 Sawy. 114. Fed. Cas. No. 2,940, may be cited. Knight v. Railroad Co., 56 Me. 234, and Railroad Co. v. Connell, 112 Ill. 295, are cases holding that through tickets in form of coupons constitute a contract with each company over whose line transportation is called for. See, also, Railroad Co. v. Weaver, 9 Lea, 38.

INJUNCTION—IN WHAT CASES A PROPER REMEDY RESTRAINING CRIMINAL ACTS.

Injunction will lie, at the suit of the state, against a corporation, when it is misusing and abusing its corporate franchises and privileges, and is maintaining its property as a nuisance, though its acts also constitute a crime. Columbian Athletic Club v. State, 143 Ind. 98, 40 N. E. 914, and 2 Am. & Eng. Dec. Eq. 346. And wherever an individual can show a distinct and irreparable injury to himself, apart from the public in general, he may maintain a bill for injunction against the acts complained of, although criminal, and although the party complained of is liable to prosecution for such acts. Such injunction will be granted where the element of irreparable injury exists in the case. Columbian Athletic Club v. State, before cited; Shoe Co. v. Saxey (decided by the supreme court of Missouri)

32 S, W. 1106; In re Debs, before referred to,—all reported in 2 Am. & Eng. Dec. Eq. 340, 356, 364. In valuable and extended notes to these cases as reported will be found modern cases illustrating the use of the injunction as a preventive remedy, wherever the facts show that the common law affords no adequate remedy for the acts when once accomplished; and it is no objection to the injunction in such cases that the acts are also criminal, as criminal prosecution furnishes no redress for a private injury sustained. See, also, Stamping Co. v. Fellows, 163 Mass. 191, 40 N. E. 105, and 2 Am. & Eng. Dec. Eq. 599, and note.

### PROTECTION OF TRADE OR BUSINESS AGAINST FRAUD.

A lawful business may be protected against fraud by injunction, although not carried on under monopoly of a valid trade-mark. So, if a person is using something to designate his articles, the exclusive right to use which cannot be claimed as a trade-mark, nevertheless, if such person can show to a court of equity that another person is selling an article like his in such way as to induce the public to believe that it is his, and that he is doing this fraudulently, he may have relief by injunction to prevent such piracy. It is a fraud for one person to palm off his manufactures as those of another person, although he commits fraud by the use of names which are not a subject of trade-mark property. California Fig Syrup Co. v. Frederick Stearns & Co., 43 U. S. App. 234, 20 C. C. A. 22, and 73 Fed. 812; Salt Co. v. Burnap, 43 U. S. App. 243, 20 C. C. A. 27, and 73 Fed. 818. Modern cases clearly are to the effect that a lawful business is entitled to protection by injunction against fraud, regardless of any question of trade-mark. Lawrence Manuf'g Co. v. Tennessee Manuf'g Co., 138 U. S. 537, 11 Sup. Ct. 396; Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966. See, also, Oxley Stave Co. v. Coopers' International Union, 72 Fed. 695; Wire Co. v. Murray, 80 Fed. 811; Central Trust Co. of New York v. Citizens' St. R. Co., Id. 218. In Blindell v. Hagan, 54 Fed. 40 (affirmed in 6 C. C. A. 86, 56 Fed. 696), it was decided that jurisdiction of the circuit court to entertain suit to enjoin a combination of persons from interfering with and preventing shipowners from shipping a crew could be maintained on the ground of preventing a multiplicity of suits at law, and because damages at law for interrupting the business and intercepting the profits of pending enterprises and voyages must, in their nature, be conjectural, and not susceptible of certain proof. It was alleged in that case that complainants could not obtain a crew without a restraining order of the court.

### FEDERAL AND STATE COURTS — WHEN INJUNCTION WILL BE GRANTED BY FEDERAL OR STATE COURTS AGAINST THE PROSECUTION OF SUITS IN EACH OTHER'S JURISDICTION.

In regard to this question, although not specially related to the question of the principal case, the following statement is found in 36 Am. Law Reg. & Rev. (July, 1897) p. 462: "As a general rule, the federal courts will not enjoin the prosecution of a suit in a state court, being prohibited by statute. Rev. St. U. S. § 720; Diggs v. Wolcott (1807) 4 Cranch, 179; Dillon v. Railway Co. (1890) 43 Fed. 109; Haines v. Carpenter (1875) 91 U. S. 254; Dial v. Reynolds (1877) 96 U. S. 340; The Mamie (1884) 110 U. S. 742, 4 Sup. Ct. 194. But cases may arise which fall without the statute. Fisk v. Railway Co. (1873) 10 Blatchf. 518, Fed. Cas. No. 4,830; French v. Hay (1874) 22 Wall. 250; Railway Co. v. Kuteman (1892) 4 C. C. A. 503, 54 Fed. 547. So, though a state court generally will not enjoin the prosecution of a suit in a federal court,—Riggs v. Johnson Co. (1867) 6 Wall. 166; U. S. v. Keokuk, Id. 514; Mead v. Merritt (1831) 2 Paige, 402; Schuyler v. Pelissier (1838) 3 Edw. Ch. 191; Town of Thompson v. Norris (1882) 63 How. Prac. 418,—it may do so in a proper case, and punish the offender for contempt if he persists,—Hines v. Rawson (1869) 40 Ga. 356." See, also, Simpson v. Ward, 80 Fed. 561; Holt Co. v. National Life Ins. Co. of Montpelier, Id. 686.

### BREACH OF INJUNCTION BY PERSONS NOT ENJOINED OR A PARTY TO THE ACTION —AIDING AND ABETTING—COMMITTAL.

In the late case of Seward v. Patterson [1897] 1 Ch. 545, the English court of appeal affirmed the decision of North, J., and held that the court had jurisdiction to commit for contempt a person not included in an injunction or a party to the action, but who nevertheless, knowing of the injunction, aided and abetted a defendant in committing a breach thereof. It was said there was a clear distinction between a motion to commit a man for breach of an injunction on the ground

that he was bound by the injunction, and a motion to commit a man on the ground that he aided and abetted in the breach of such injunction.

With respect to the use of the injunction and the parties who may be made defendants to the same bill in respect to the same subject-matter, the following cases may be referred to generally: Lembeck v. Nye (decided May 20, 1890) 47 Ohio St. 336, 24 N. E. 686; Morgan Envelope Co. v. Albany Perforated Wrapping-Paper Co., 40 Fed. 577; Supply Co. v. McCready, 4 Ban. & A. 588, Fed. Cas. No. 295; Snyder v. Bunnell, 29 Fed. 47; Wallace v. Holmes, 9 Blatchf. 65, Fed. Cas. No. 17,100; Chemical Works v. Hecker, 2 Ban. & A. 351, Fed. Cas. No. 12,133; Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52; Tilghman v. Proctor, 102 U. S. 707; Travers v. Beyer, 26 Fed. 450; Alabastine Co. v. Payne, 27 Fed. 559; Cuervo v. Jacob Henkell Co., 50 Fed. 471; Von Mumm v. Frash, 56 Fed. 830; Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 25 C. C. A. 267, 77 Fed. 288. See, also, Id., 65 Fed. 620; Cooley, Torts, p. 153; 1 Jagg. Torts, § 123; Varick v. Smith, 5 Paige, 137; Emigration Co. v. Guinault, 37 Fed. 523; Story, Eq. Pl. § 284.

With special reference to the protection of business from injury by conspiracy or combination, directly or indirectly, the following well-considered cases may be consulted with much advantage: Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307; Curran v. Galen, 152 N. Y. 33, 46 N. E. 297; Murdock v. Walker, 152 Pa. St. 595, 25 Atl. 492; Barr v. Trades Council, 53 N. J. Eq. 101, 30 Atl. 881; Vegelahn v. Guntner (Mass.) 44 N. E. 1077; Spinning Co. v. Riley, L. R. 6 Eq. 551 (decided in 1868); Carleton v. Rugg, 149 Mass. 550, 22 N. E. 55; Littleton v. Fritz, 65 Iowa, 488, 22 N. W. 641; State v. Crawford, 28 Kan. 726; Kansas v. Ziebold, 123 U. S. 626, 8 Sup. Ct. 273.