AMERICAN FISHERIES CO. v. LENNEN et al.

(Circuit Court, D. Connecticut. November 18, 1902.)

No. 1,077.

1. JURISDICTION OF FEDERAL COURT—AMOUNT IN CONTROVERSY—SUIT FOR IN-JUNCTION.

In a suit to enjoin defendants from continuing a business in which they have engaged in violation of a contract with complainant, the amount or value in dispute for jurisdictional purposes is the value of the object to be gained by the suit, and not the amount of complainant's damages, and a federal court has jurisdiction where the value of the plant owned and operated by defendants and the amount of the business done by them annually largely exceeds the jurisdictional amount.

2. CONTRACTS—CONSTRUCTION—AGREEMENT NOT TO ENGAGE IN CERTAIN BUSI-NESS.

Complainant's assignor purchased a number of fishing plants situated along the Atlantic coast from Maine to Delaware, two of such plants having been purchased from defendants, who were joint owners. It paid a considerable sum, in addition to the actual value of the plants, for their good will, under a contract which bound defendants not to engage in the fishing business or the manufacture of certain fish products for the term of 20 years, "upon, along, or off the Atlantic seaboard." Held, that such prohibition included all the waters adjacent to the Eastern coast of the United States, and was not limited to so much of the coast as lies north of Delaware, nor did it exclude the bays or other indenta-tions along the coast; and that defendants violated the contract by sub-sequently going into the Chesapeake Bay, and there purchasing and operating a fishing plant from which they conducted fishing operations both within and outside of the bay.

3. SAME—VIOLATION.

The fact that complainant, being a nonresident corporation, was pre-cluded by the laws of the states adjoining the bay from fishing in their waters, did not relieve defendants from the effect of the restriction im-posed upon them by the contract as to such waters.

4. SAME—SPECIFIC ENFORCEMENT BY INJUNCTION.

A court of equity will enforce specific performance of a restrictive contract by injunction, where it is apparent from a view of all the cir-cumstances of the case that it will subserve the ends of justice, as where the damages caused by its violation are not susceptible of proof.

---

¶ 1. Jurisdiction of circuit courts as determined by amount in controversy, see notes to Auer v. Lombard, 18 C. C. A. 75; Shoe Co. v. Roper, 36 C. C. A. 459.

See Courts, vol. 13, Cent. Dig. § 890.

In Equity. Suit for injunction. Heard on the merits on pleadings and proofs.

For former opinion on demurrer, see (C. C.) 116 Fed. 217.

Goodwin Stoddard, for complainant.

H. A. Hull, Wm. F. M. Rogers, and Perkins & Perkins, for defendants.

PLATT, District Judge. The complainant filed this bill some time since, asking for an injunction restraining the defendants, and each of them, for the period of 20 years from the 26th day of November, 1897, from becoming interested in or connected with any business other than that conducted by the complainant, its successors or assigns, in catching menhaden, herring, or other fish used in the manufacture of oil or scrap, and from either directly or indirectly becoming interested in the business of manufacturing such fish, or any fish, into oil or guano, upon, along, or off the Atlantic seaboard. The complainant is the assignee of the American Fisheries Company, and there is no question as to diverse citizenship or the regularity and validity of the assignments. Whatever dispute did arise has been cured by proper amendment. The bill was demurred to mainly on the ground that the covenant was in restraint of trade, and therefore illegal and void, and the demurrer was overruled. Answers were then filed by each defendant, and, as they are substantially alike, a brief statement of the points made by one will cover the general line of defense.

The substantive averments of the bill are admitted. Various defenses are then set forth: (1) No knowledge that Church assigned the contract made with him to the American Fisheries Company. This defense, and all other objections based upon invalidity or irregularity of the transfers, had been fully met by proofs and amendment by the complainant and admissions by the defendants. (2) That the assignment was illegal, because the restrictive covenant therein was in restraint of trade. This defense was disposed of in the opinion overruling the demurrer. (C. C.) 116 Fed. 217. (3) That the defendants had a parol agreement, contemporaneous with the contract in suit, that the American Fisheries Company, its successors and assigns, would furnish them employment in catching and manufacturing menhaden and other fish, and that agreement has not been carried out. (4) That at or about the time the respondents sold their plants, the American Fisheries Company bought out "all or nearly all" the plants of a like character, from Maine to Delaware, and entered into similar restrictive covenants with the vendors; that nothing was purchased south of Delaware; that a large fleet of vessels with many owners occupied the Atlantic seaboard of the state of Virginia, and the waters of the Chesapeake Bay, and that, therefore, the expression "upon, along, or off the Atlantic seaboard" in the contract in suit "was intended to mean, and did mean, the Atlantic seaboard in the locality from and including the state of Delaware to and including the state of Maine, but not the Atlantic seaboard south of said state of Delaware." (5) That complainant was

forbidden by the laws of Maryland and Delaware from fishing in the waters of the Chesapeake Bay or of the state of Virginia. (6) Complainant has not been damaged, or its rights injured, by the business conducted by the Menhaden Oil & Guano Company, although one defendant is the business manager, and the other is the secretary, of that corporation. The complainant then asked for an injunction pendente lite, and the matter was submitted on affidavits, and argued on July 17, 1902. It seemed wiser that the entire matter should be closed at an early day; and for that reason no action was then taken, and the final hearing was fixed for September 23, 1902. It was then fully investigated on affidavits and oral testimony, and counsel were permitted to present their opposing views at full length in writing.

The following is a condensed statement of the facts which seem material to the issue presented: James Lennen and Louis P. Allyn had, prior to this action, been for many years engaged in the fishery business. In 1896 they became jointly interested therein. They owned plants situated on leased grounds at Lewes, Del., and Sag Harbor, Long Island. These plants, including the equipment, were worth about $40,000, exclusive of good will, when the contract was made over which this controversy arises. Through the efforts of one N. B. Church, some 17 plants were bought from 14 owners, the plants at Lewes and Sag Harbor being included therein. This happened in the year 1897. The different agreements to sell were given to said Church, and ran to himself and his assigns, and contained the restrictive covenant, which raises one of the contentions upon which this dispute hinges. Thereafter, about February 21, 1898, the respondents signed, executed, and delivered the contract in suit, reciting therein the contract with Church, and the assignment thereof by him to the American Fisheries Company. They covenanted with that company:

"That we will not, nor will either of us, be or become interested in or connected with any business other than that to be conducted by said the American Fisheries Company, its successors or assigns, in catching menhaden, herring, or other fish used in the manufacture of oil or scrap, nor will we, or either of us, either directly or indirectly, become interested in the business of manufacturing such or any fish into oil or guano upon, along, or off the Atlantic seaboard, for the period of twenty years from the 26th day of November, 1897; it being the intention of this agreement to bind ourselves, and each of us, firmly by these presents, not to enter into or become, directly or indirectly, interested in the business of catching or manufacturing any fish when caught into oil or guano during the period of twenty years above mentioned."

This contract was made with a corporation organized in January, 1898. The option to Church was executed November 26, 1897. The respondents did not attempt to get a guaranty of employment from Church in connection with the option which they gave him. They made efforts in that direction at or about the time of making the contract of February 21, 1898, but signed, executed, and delivered the same just as it reads to-day. They sold thereunder their two plants for $60,000, less 5 per cent. and Church's expenses. The American Fisheries Company consolidated the 17 plants so pur-

chased into 5 working establishments. In March, 1900, the American Fisheries Company went into the hands of receivers, under the chancery laws of New Jersey. A reorganization was effected, and by various proper steps, unnecessary to relate here, the present complainant came into existence, and was invested with all the property, rights, and franchises of the insolvent corporation, including therein a specific assignment of the contract in suit, dated July 11, 1900. After the American Fisheries Company became embarrassed, the respondents took part in the purchase of a fishing plant at Harburton, Va., and on April 11, 1900, assisted in the organization and management of the Menhaden Oil & Guano Company, which acquired, refurnished, equipped, managed, and carried on the plant and business of menhaden fishing and manufacturing at Harburton. The stock in that corporation is largely owned by the families of the respondents, and the respondents themselves are in the active management of the plant, Lennen as treasurer and general manager, and Allyn as secretary. Both receive salaries from the corporation.

In their brief, counsel for the defendants raise at the outset and for the first time the objection that upon the face of the papers the only reason for being here grows out of diverse citizenship, and that in such case the matter in dispute must exceed $2,000; that in bills in equity the object to be gained by the bill is the criterion; and that the actual damage in this case is little or nothing. This contention may well be disposed of at the threshold, since, if it were valid, the discussion would end at the beginning. It is plain that in such a case as this the subject-matter in dispute is the essential factor which confers or prevents jurisdictional authority. In bills asking that the use of a name be enjoined, the court does not look to the actual damages which might be recovered, but to the importance of the right to the complainant. Symonds v. Greene (C. C.) 28 Fed. 834. When an injunction is asked against the erection and maintenance of a nuisance, it is not important to discuss what amount of damage would result if the nuisance were operated, but rather what the cost of the alleged nuisance will be (Rainey v. Herbert, 5 C. C. A. 183, 55 Fed. 443), the general principle being enunciated in Railroad Co. v. Ward, 2 Black, 485–492, 17 L. Ed. 311. The fact that an actual injury resulting from the violation of a right is small, and the interest to be effected by an injunction is large, is not to weigh against the interposition of preventive power in equity when it is clear that on one hand a right is violated and on the other a wrong committed. Railroad Co. v. McConnell (C. C.) 82 Fed. 65. The value of the object to be gained by the bill is the criterion in each case. In the present inquiry the object to be gained is to prevent the defendants from continuing their connection, directly or indirectly, with the plant, equipment, and business of the Menhaden Oil & Guano Company. The evidence shows beyond peradventure that their actual cash interest therein, direct and indirect, through themselves or their families, is largely in excess of the jurisdictional amount. The salaries alone which they receive as the managing and controlling spirits are sufficient to furnish jurisdiction. The annual catch of fish, together with the oil and guano and scrap into which the fish are trans-

muted, are excessively ample. It would be idle and superfluous to state in concrete form that the matter in dispute exceeds, exclusive of interest and costs, the sum of $2,000.

The next point of interest is this: What is meant by the words "upon, along, or off the Atlantic seaboard," when construed in the light of the circumstances surrounding the contract in which they appear? In the opinion filed in connection with my decision against the demurrer I used this language:

"In reaching this conclusion I assume that the 'Atlantic Seaboard' must refer to all the waters adjacent to the Eastern coast of the United States. Any narrower construction than that would leave the defendants at liberty to enter into a like business under such conditions as would necessarily bring about direct and immediate competition with that of the vendee."

In the full light of the completed case nothing has transpired which argues ambiguity, abstruseness, uncertainty, doubt, or mystery in any way touching those words. They are as plain and simple to-day as they seemed to be when I first studied them. "Seaboard" means the country bordering on the sea; and the sea, if we can depend upon the makers of the Century Dictionary for authority, is "a more or less distinctly limited or landlocked part of the ocean, having considerable dimensions"; and they also thought that "sea, bay, and gulf are more or less synonymous terms." The language seems peculiarly fitted to the Chesapeake Bay, and to many another indentation of the coast, all the way from Maine to Florida.

What were the parties trying to come at when they made their bargain? The complainant's assignor paid $20,000 for the good will of two plants and the removal of two experienced competitors from its path. It can hardly be seriously claimed that the purpose was that they should refrain from deep-sea fishing alone, or from fishing, deep or shallow, north of Cape Charles, but should have absolute, unrestrained leave and license to go down around the corner of the cape and take up the same old business at a new stand on the bay. I might say incidentally, right here, that the very fact that a large business in the bay was left untouched by Church and those for whom he acted would seem to relieve the complainant and its assignors from any taint of monopolistic greed in this enterprise; and also, incidentally, that the defendants admit that they did fish, to some extent, upon the very locality which, by their construction of the covenant, was forbidden water, and to that extent they ought to be enjoined; so that the real contention is as to the terms of the injunction. Such a prohibition, however, would be practically nugatory from the very circumstances of the case; at best, it could not strike at anything except deep-sea fishing. The facts warrant, in my opinion, a remedy much more searching and drastic than that. It was a business transaction. The words used were apt, to bring about exactly what the parties wished to accomplish. A seafaring man, with a plain education (and both defendants answer that description), could understand and appreciate the purpose sought for and the end to be gained, and each word used contributed to the result. "Upon" and "along" clearly refer to the waters adjacent to and easily reached from the coast line; "upon" relating to any given

spot or place, and "along" extending the suggestion from the very northern to the very southernmost point of that coast line. "Off" adds to and enlarges the meaning of the other words, and was intentionally placed there. It carries the prohibition out into the deeper water more distant from the coast. The coast line cannot be found by drawing straight lines from the outermost projections, leaving all the balance of the sea which creeps into the indentations free for fishing. If so, the prohibition is frivolous, nugatory, and nonsensical. In one breath the defendants contend that the prohibition is confined to deep-sea fishing, in the next breath they endeavor to draw the line of prohibition east and west at Cape Charles. In the one instance they must keep out in deep water from Maine to Florida, and never fish within indentations; in the other instance they can sail out into the ocean at will, and fish within indentations ad libitum, but must confine their excursions to the waters south of a line through the Cape Charles headland. An interpretation of the restrictive covenant, based upon either contention, would not bring about the result which the parties had in mind, and, looking at the matter from one of the points of view, competition could be continued with composure. The menhaden is a migratory fish, and it is only a question of days whether he is caught above or below an imaginary east and west line, whatever style of fishing is adopted. The plant at Lewes was just inside the Delaware Breakwater. It was quite convenient to both deep-sea and protected fishing. Defendants sold the plant at an extra price with that convenience attached. It is almost incredible that they expected to retain the right to go down the coast a few miles to a plant which was also confessedly so situated as to offer free and convenient access to both kinds of fishing. They would not have thought of starting up a business at Harburton if the complainant's assignor had not fallen into difficulties in the New Jersey courts. This is evident from the admissions found in the letters of one of the defendants. The negotiations for that plant were begun with fear and trembling, and with expressed doubts. There was hope that the American Fisheries Company might die the death, and the restrictive covenant die with the corporation. They acted covertly and stepped with gingerly tread, and, when brought to book, threw aside all disguise, openly avowed their acts, and said, We are not violators, we remain in Chesapeake Bay. True, we may have gone outside for a few miles toward the old plant which we sold you, but we did not catch many fish. At any rate, we propose to fight it out, and contracts are queer things, hard to enforce, and "there is many a slip 'twixt the cup and the lip." They employed able counsel, and have made a stubborn and vigorous fight, but equity is imperturbably calm, clearsighted, and far-reaching, and she will easily brush aside the defenses so ingeniously contrived to entangle her path and obscure her vision. The arguments bearing upon this point are not persuasive.

We come next to the contention that there was a parol agreement, contemporaneous with the contract in suit, by which employment was guarantied to the defendants, and that the promise has been broken, and that equity should cast out the violator of one part

of the bargain when he seeks to enforce the other, even if it was in words and not in the writing. Testimony on this phase of the case was received to show extrinsic circumstances, which, if true, would cause a court of equity to hesitate in ordering the restrictive covenant of the contract carried into operation. Scrutinizing the evidence with microscopic pains, and with a disposition to help the defendants, if the chance to help them exists, the court is forced to find that Church did not at any time, either for himself or for his assignee, in connection with, or apart from, the contract upon which this bill is based, promise to employ the defendants, or either of them; and there is certainly no evidence that the American Fisheries Company made or was asked to make any such bargain, if Church is to be eliminated from the proceedings. Nor was there any attempt on the part of any one to hoodwink the defendants into their bargain under a misunderstanding; on the contrary, the transaction was open and aboveboard, and the defendants undertook what they did in the full light of day.

It is contended further that there was no serious and irreparable damage. The damage certainly seems serious enough, and damages are always understood to be irreparable when they cannot be measured by any certain pecuniary standard. When damages caused by the injury are not susceptible of proof or estimation, an injunction will lie. When one, having agreed not to do so, does engage in a particular business, it is no answer to a demand that he should stop, to say, "I do not hurt you very much; please be patient and endure with philosophy the pain which I am inflicting; it may smart a trifle, but the disability will not be permanent."

Defendants further argue that they ought not to be restrained, because they have only two steamers and four sail vessels, and form a meager part of the great fleet, both steam and sail, which venture out upon the waters of the Chesapeake Bay, and, I presume, beyond. The answer is obvious. Defendants were paid to refrain from competition, and the others were not. Whether the others were wiser in their day and generation, or more foolish, or if they lacked an equally good chance, is not known, but the simple fact remains that none of them are under restrictive covenants, and, so far as the complainant is concerned, are at liberty to sail as they will and fish where they may. These privileges, however, do not extend by analogy to the defendants. They made their own bed, and ought to occupy it gracefully. It is not good logic, good morals, or equity, for them to claim the right to eat their cake and enjoy it indefinitely after it has been eaten. And, they say, the market remains normal. What they have caught, or may catch, will not affect the market price; but the former managers of the other purchased plants may also have been experienced fishermen, and if defendants can continue their marauding expeditions under judicial authority, so may the other mariners, and when the entire batch of vendors from the 17 or more plants have followed suit, moved their stakes, and taken up new fields south of Cape Charles, incomprehensible harm might follow, especially since the fish starts from the south and travels northward.

The injured party only asks that the defendants live up to the bar-

gain which they made, and under which they obtained a bonus greater than the amount which they have invested, directly or indirectly, in the Harburton plant. The cases cited by counsel on this question all cluster about the discussion as to whether a court of equity will decree a specific performance of a contract of sale, or will leave the parties to their remedy at law. A decree is usually entered, but whether it shall be or not is a matter of sound discretion, and that discretion can be invoked if the sale will work hardship or injustice to either party. Even in such cases, the supreme court says, in Willard v. Tayloe, 8 Wall. 567, 19 L. Ed. 501, "In general it may be said that the specific relief will be granted when it is apparent from a view of all the circumstances of the particular case that it will subserve the ends of justice."

A word ought to dispose of the claim that because the defendants have become connected with a corporation which can fish in Virginia and Maryland waters, which privilege is denied to the complainant because it is a nonresident, therefore equity should not enforce the restrictive covenant of the contract in suit. The mere statement of the proposition ought to exhibit the non sequitur of its alleged logic.

It was promised that in this opinion a definite ruling would be made upon the admissibility of certain testimony, set forth in the depositions, to which a general objection was entered at the time of taking the proofs. The opinion in itself, if carefully read, will make clear my position; but, to be explicit, the testimony is received and used so far as it bears upon the character, nature, extent, or explanation of the connection which existed between the defendants and the Menhaden Oil & Guano Company, and the letters written by Lennen are used so far as they contain admissions describing the kind of connection, or his views of the right or wrong of that connection.

The restrictive covenant, which was incorporated in the option given to Church and his assigns, and appears in the contract in suit, is lawful, and was paid for as incidental to the contract of sale, and, with the interpretation herein given, the relief demanded is no more than is reasonably necessary to afford a fair protection to the complainant.

Let a decree be prepared which will provide such relief, with the costs of this suit.