[No. 5803.]

## KIRBY ET AL. V. UNION PACIFIC RAILWAY COMPANY.

1. PASSENGER CARRIER—*Non-Transferable Tickets*—A railway company may lawfully issue tickets which are not transferable by the holder. The condition which prohibits transfer is a legal contract, and the railway company is under no obligation to carry a person presenting such ticket, unless he is in fact the original purchaser—(514).

Such tickets are not property in the hands of the purchaser in such sense that they can be sold. Dealing therein is a fraud both upon the railway and the traveling public and cannot be made a legitimate business—(515).

A railroad ticket is a mere token to show that the person properly in possession of it has paid his fare. If transferred in violation of its terms, it is no longer property in an sense, but as much under the ban of the law as counterfeit money.

2. INJUNCTION—*Protection of a Lawful Business Against Unlawful Interference*—One who prosecutes a lawful business has a property therein, and is entitled to protection against unlawful interference therewith—(515).

A railroad company had for a long time, issued tickets entitling the holder to proceed to destination and return, for a single fare. These tickets were expressly declared, upon the face thereof to be non-transferable.

The defendants were engaged in the purchase of the portion of these tickets entitling the holder to return, and the sale thereof to strangers, whom they instructed to falsely impersonate the original purchaser. They declared their purpose to continue in this course of illicit dealing. By this abuse of the ticket, practically impossible to detect, and by the frauds so habitually practiced, the railway company was deprived of enormous gains to which it was entitled. *Held*, that on the ground of constantly recurring wrong, the avoidance of a multiplicity of actions, and irreparable injury, a clear case for injunctive relief was presented—(521, 522).

3.   ——*Estoppel—Connivance*—That the plaintiff had on previous occasions sold like tickets to the defendants and connived at the sale thereof by defendants to others was held no bar to the relief prayed, each sale of such non-transferable tickets being a new and independent wrong, distinct from former transactions—(522, 526).

4. ——*Estoppel by Conduct*—That the railroad company had for a long time patiently suffered the wrongful conduct of defendants, no evidence of good faith on the part of defendants being given, and it not appearing that defendants conduct had in any manner been changed, or that defendants had been in any degree misled by anything done or omitted by the railroad company, was held no estoppel.

The doctrine of equitable estoppel is never available to sustain crime, fraud, or active misconduct of any character.

No defense to the plaintiff's action was presented by the doctrine of laches and acquiescence—(526-534).

5. ——*Preliminary—Affidavit*—If the defendant against whom a preliminary injunction has been issued without notice, no emergency existing, would avail himself of the final proviso of sec. 148 of the code as amended by the act of 1903 (Laws 1903, c. 117, Rev. Code sec. 164), he must move in the trial court. Failing in this he will not be heard to make the objection in the court of review—(543).

The record held to show an emergency, within the meaning of the statute entitling plaintiff to a preliminary injunction without notice—(544).

6. EQUITY—*Maxims—Coming With Clean Hands*—To deprive the complaining party of equitable relief evil practice in the very matter in respect to which redress is sought must be shown. Equity does not repel all sinners—(525).

7. CORPORATIONS—*Foreign—License Tax*—Under the decision of the supreme court of the United States in American Co. v. Colorado, 204 U. S. 103, the license tax imposed by the Revenue Act of 1902 (Laws 1902 c. 3, sec. 65), cannot be exacted from a corporation, which, before its enactment, had paid the entrance tax requested by those entering legislation, and secured a license to do business in this state—(542).

8. CHANGE OF VENUE—Sections 25 and 25a of Mills' Code (Rev. Code secs. 25 and 26) refer exclusively to actions *in rem,* where specifis property is directly affected. An action to restrain interference with the business of a railway company by unlawful dealing in its non-transferable tickets is a transitory action in *personam.* The sections quoted have no reference to such action—(535).

9. ——*Waiver of the Motion*—An application for the change of the venue must be made as soon as the moving party has knowledge of the facts which entitle him to the change. A general appearance and pleading to the merits is a waiver of the rights—(541, 542).

*Error to Pueblo District Court*—Hon. N. WALTER DIXON, Judge.

Mr. O. N. HILTON and Mr. RALPH TALBOT for plaintiffs in error.

Messrs. DORSEY & HODGES and Mr. JOHN L. BALDWIN for defendant in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

This is one of eight cases, by as many railroad companies, operating in the state of Colorado, for injunctive relief, against some sixty-five defendants, railroad ticket brokers or scalpers, located at Denver, Pueblo, Colorado Springs, Trinidad and other Colorado cities, to prevent the alleged fraudulent and wrongful interference by the defendants with the lawful business of the plaintiff, in the issuance and sale of nontransferable signature tickets. The complaint charges in substance that the defendants are engaged in negotiating the sale of nontransferable tickets, or the return portions thereof, and in aiding and procuring other than the original purchasers to secure, or attempt to secure, passage upon the various trains of the plaintiff, on such nontransferable signature tickets, contrary to the express terms thereof; that the defendants have organized into associations for the purpose of carrying on such wrongful and fraudulent business, and that as a result the plaintiff is suffering great pecuniary loss, and is about to suffer still greater damage, unless such conduct be prevented; and that plaintiff has no adequate remedy at law, because of the difficulty of detecting such frauds, because of the multiplicity of suits that would be required, because of the insolvency of practically all of the various defendants, and for other reasons specifically set forth in the complaint. It is definitely alleged that the defendants

have engaged, are now engaging and will continue to engage in dealing in this character of tickets. These allegations are not only not denied, but it is expressly averred by the defendants that they are now engaged in such practices and intend to continue the same in the future. At folio 158 of the answer it is expressly averred: "And these defendants admit that they have sold, and are engaged in the business of selling, and purpose to and will continue in the business of selling and regularly dealing in, said nontransferable tickets, issued for transportation over plaintiff's railway." The defendants further, by answer, deny that they are engaged in an unlawful business, and aver that they have been dealing for years in the character and kind of tickets mentioned in the complaint without hindrance on the part of the railroad company, and allege connivance by it, in their conduct in this behalf, and laches and acquiescence. They deny any fraud, and allege that the railroad company has no legal right to embody stipulations of nontransferability in its tickets, and that such limitations are of no legal force and are not binding.

Not only is the principal fact admitted, but the various fraudulent devices adopted by the defendants, including forgery of tickets, the raising of the limit of tickets, the forging of the name of the original purchaser by the broker, or by some other person through his procurement, the methods adopted for deceiving the conductors on the trains of plaintiff, and the instructions given to the purchasers of such tickets, in order that they may successfully impersonate the original purchasers, are all testified to by witnesses for the plaintiff, and no evidence is offered to refute this showing. The evidence establishes conclusively that these practices have resulted, and will result in enormous financial losses to the plaintiff, and will render it practically impossible for railroad companies to continue

to grant special rates for special occasions, and there is no evidence by defendants to the contrary. The evidence of persistent and continued interference by the brokers, in manner and form as alleged, with the business of plaintiff, in the issuance and sale of nontransferable tickets, causing and threatening to cause great financial loss, is overwhelming and convincing.

A temporary writ of injunction issued, enjoining the defendants from buying, selling, dealing in or soliciting the purchase or sale of tickets, or of the return or unused portions thereof, issued by plaintiff over its lines, which are by their terms nontransferable, and from soliciting, advising, encouraging, procuring, or attempting to procure, any person or persons other than the original purchasers to use such tickets. On final hearing the temporary writ was made permanent. Defendants bring the case here for review on error.

The grounds upon which the defendants rely for a reversal of the judgment and decree complained of are:

1.   That the complaint states no cause of action cognizable by a court of equity, because, it is claimed, the railroad company could not lawfully impose the limitations contained in nontransferable tickets; that no actual damage has been shown; and that the defendants are guilty of no legal wrong;

2.   That the plaintiff companies have, if entitled to any relief, a plain, speedy and adequate remedy at law;

3.   That the court had no power or authority, by temporary or permanent injunction, to assume to govern and control the future acts of defendants in the purchase and sale of so-called nontransferable tickets, or unused portions thereof;

4.   That plaintiffs are estopped to maintain the action, because of laches, connivance and acquiescence in like conduct by the defendants covering a time prior

to the application for the injunction;

5.    That the defendant company is precluded from maintaining this action at all, because of its failure to pay the annual state license tax provided by statute;

6.    That the court erred in refusing to discharge the temporary restraining order, issued without notice, and dismiss the action, upon the ground that it is not shown that any emergency existed for its issuance; and,

7.    That it was error in the court to overrule the separate motions of two of the defendants for a change of venue.

Every fundamental and vital contention of the defendants has been adjudged against them by an overwhelming weight of authority. The following legal propositions are definitely settled and fixed in cases resting upon similar facts to those shown in the present record:

1.    That a clear case of equitable jurisdiction, on the grounds of irreparable injury, inadequacy of a legal remedy, and of the necessity of avoiding a multiplicity of suits, is made out under circumstances and conditions such as are here alleged and proven.—*Nashville C. & St. L. R. Co. v. McConnell,* 82 Fed. 65; *Delaware, L. & W. R. Co. v. Frank,* 110 Fed. 689; *Kinner v. Lakeshore & M. S. R. Co.,* 69 Ohio St. 399; *Pennsylvania R. Co. v. Beekman,* 30 Wash. L. Rep. 715; *Illinois C. R. Co. v. Caffrey,* 128 Fed. 770; *Schubach v. McDonald,* 179 Mo. 163; and *Bitterman v. L. & N. R. Co.,* 207 U. S. 205.

2.    That the contract evidenced by nontransferable tickets described in the complaint is a legal contract between the railroad company and the purchaser of such tickets, and binds the parties thereto and limits the benefits of the contract to the use of the original purchaser only; that no one other than such purchaser can become the beneficiary of such contract, and under its terms the railroad company is under no obligation

to carry as a passenger any person presenting such ticket, unless such person is in fact the original purchaser.—*Mosher v. St. Louis I. M. & S. R. Co.*, 127 U. S. 390; *Eastman v. R. R. Co.*, 70 N. H. 240; *Way v. Chicago, etc., Rwy. Co.*, 64 Ia. 48; *Demilley v. T. & N. O. Ry. Co.*, 91 Tex. 215; *Dangerfield v. Railway Co.*, 62 Kan. 85; *Boylan v. Hot Springs R. Co.*, 132 U. S. 146; *Drummond v. Southern P. R. Co.*, 7 Utah 118; *Bitterman v. L. & N. R. Co., supra;* and 4 Elliott on Railroads, Sec. 1599.

3. That such tickets are not property in the hands of the purchaser, in the sense that they can be transferred or sold, and trafficking in them is not and cannot be made a legitimate business.—*State v. Corbett*, 57 Minn. 345; *Jannin v. State*, 42 Tex. Crim. Rep. 631; *Burdick v. People*, 149 Ill. 600; *Drummond v. Southern P. R. Co., supra; Pennsylvania R. Co. v. Beekman, supra; Schubach v. McDonald, supra; Nashville C. & St. L. R. Co. v. McConnell, supra;* and 4 Elliott on Railroads, Sec. 1593.

4. That the business of a person or corporation is property which is entitled under the law to protection from unlawful interference, and such interference may be prevented by injunction. *National Teleg. News Co. v. Western Union Teleg. Co.*, 60 L. R. A. 805; *Hopkins v. Oxley Stave Co.*, 83 Fed. 912; *Hamilton-Brown Shoe Co. v. Saxey*, 131 Mo. 212; *Flaccus v. Smith*, 199 Penn. 128; *Scott v. Donald*, 165 U. S. 107; *Sherry v. Perkins*, 147 Mass. 212; *Nashville C. & St. L. R. Co. v. McConnell, supra; Railway Co. v. Bitterman*, 144 Fed. 34; *Lake Shore & Michigan So. Ry. Co. v. Smith*, 173 U. S. 684; and *Smyth v. Aimes*, 169 U. S. 466.

5. That by the scalping of its nontransferable tickets the railroad company sustains a pecuniary loss. There is no process of reasoning, however strained, which can even as a matter of form conceal the ultimate fact, that the company is deliberately cheated out of the regular fare on every mile of its line on which

travel is made under color of one of these tickets in the hands of any one other than the original purchaser. —*Angle v. Chicago St. P. M. & O. R. Co.*, 151 U. S. 1; *Flaccus v. Smith, supra; Raymond v. Yarrington,* 96 Tex. 443; *Illinois Central Rwy. Co. v. Caffrey, supra; Nashville C. & St. L. R. Co., v. McConnell, supra;* and *Bitterman v. L. & N. R. Co., supra.*

The decision in *Bitterman v. Louisville & N. R. Co., supra,* decided since this case was lodged here, is conclusive against these defendants upon every controlling question. In the opinion in that case, by the present Chief Justice of the United States supreme court, is was said, among other things:

"As, for reasons hereafter to be stated, we think the contentions embodied in the first proposition as to want of jurisdiction, etc., are without merit, we come at once to the fundamental question involved in the second proposition; that is, the absence of averment or proof as to the commission of a legal wrong by the defendants.

That the complainant had the lawful right to sell nontransferable tickets of the character alleged in the bill at reduced rates we think is not open to controversy, and that the condition of nontransferability and forfeiture embodied in such tickets was not only binding upon the original purchaser, but upon any one who acquired such a ticket and attempted to use the same in violation of its terms, is also settled. (Cases cited.)    *    *    *    *

Any third person acquiring a nontransferable reduced-rate railroad ticket from the original purchaser, being therefore bound by the clause forbidding transfer, and the ticket in the hands of all such persons being subject to forfeiture on an attempt being made to use the same for passage, it may well be questioned whether the purchaser of such a ticket acquired anything more than a limited and qualified ownership

thereof, and whether the carrier did not, for the purpose of enforcing the forfeiture retain a subordinate interest in the ticket, amounting to a right of property therein, which a court of equity would protect.—*Board of Trade v. Christie Grain & Stock Co.*, 198 U. S. 236, and authorities there cited. See also, *Sperry & Hutchinson Co. v. Mechanics' Clothing Co.*, 128 Fed. Rep. 800. We pass this question, however, because the want of merit in the contention that the case as made did not disclose the commission of·a legal wrong conclusively results from a previous decision of this court.—The case is *Angle v. Chicago, St. Paul etc., Ry. Co.*, 151 U. S. 1, where it was held that an actionable wrong is committed by one who 'maliciously interferes in a contract between two parties and induces one of them to break that contract to the injury of the other.' That this principle embraces a case like the present, that is, the carrying on of the business of purchasing and selling nontransferable reduced rate railroad tickets for profit, to the injury of the railroad company issuing such ticket is, we think, clear. It is not necessary that the ingredient of actual malice in the sense of personal ill will should exist to bring this controversy within the doctrine of the Angle case. The wanton disregard of the rights of a carrier causing injury to it, which the business of purchasing and selling nontransferable reduced rate tickets of necessity involved, constitute legal malice within the doctrine of the Angle case. We deem it unnecessary to restate the grounds upon which the ruling in the Angle case was rested, or to trace the evolution of the principle in that case announced, because of the consideration given to the subject in the Angle case and the full reference to the authorities which was made in the opinion in that case.

Certain it is that the doctrine of the Angle case has been frequently applied in cases which involved

the identical question here at issue—that is, whether a legal wrong was committed by the dealing in nontransferable reduced rate railroad excursion tickets. (Cases cited.)

Indeed, it is shown by decisions of various state courts of last resort that the wrong occasioned by dealing in nontransferable reduced rate railroad tickets has been deemed to be so serious as to call for express legislative prohibition correcting the evil. (Cases cited).—*Samuelson v. State*, 95 S. W. Rep. 1012. In the case last referred to, where the subject is elaborately reviewed, the supreme court of Tennessee, in holding that the prohibitive statute was not unconstitutional as forbidding a lawful business and in affirming a crimal conviction for violating the statute observed:

'That the sale as well as the purchase of nontransferable passage tickets is a fraud upon the carrier and the public, the tendency of which is the demoralization of rates, has been settled by the general consensus of opinion amongst the courts.'

Concluding, as we do, that the commission of a legal wrong by the defendants was disclosed by the case as made, we are brought to consider the several contentions concerning the jurisdiction of the court and its right to afford relief."

Upon the question of the right to relief by injunction in a case like this, further on in that opinion, the writer thereof has this to say:

"The contention that, though it be admitted, for the sake of the argument, that the acts charged against the defendant 'were wrongful, tortious, or even fraudulent,' there was no right to resort to equity because there was a complete and adequate remedy at law to redress the threatened wrongs when committed is, we think, also devoid of merit. From the nature and character of the nontransferable tickets, the number of

people to whom they were issued, the dealings of the defendants therein and their avowed purpose to continue such dealings in the future, the risk to result from mistakes in enforcing the forfeiture provision* and the multiplicity of suits necessarily to be engendered if redress was sought at law, all establish the inadequacy of a legal remedy and the necessity for the intervention of equity.  In deed the want of foundation for the contention to the contrary is shown by the opinions in the cases which we have previously cited in considering whether a legal wrong resulted from acts of the character complained of, since in those cases it was expressly held that the consequences of the legal wrong flowing from the dealing in nontransferable tickets were of such a character as to entitle an injured complainant to redress in a court of equity."

Upon the proposition that the court erred in issuing the temporary injunction and making it permanent against dealing in nontransferable tickets to be issued in the future, in this same opinion the learned Chief Justice said:

"The circuit court of appeals decided that error had been committed in refusing to grant an injunction against dealing in nontransferable tickets to be used in the future, and directed that the decree below be enlarged in that particular.  It is insisted that the circuit court of appeals erred in awarding an injunction as to dealings 'in nontransferable tickets that may be hereafter issued  *  *  *  since it thereby undertook to promulgate' a rule applicable to conditions and circumstances which have not yet arisen, and to prohibit 'the petitioners from dealing in tickets not *en esse*  *  *  *  and is, therefore, violative of the most fundamental principles of our government.'  But when the broad nature of this proposition is considered it but denies that there is power in a court of equity in any case to afford effective relief by injunction.  Certain

is it that every injunction in the nature of things contemplates the enforcement as against the party enjoined of a rule of conduct for the future as to the wrong to which the injunction relates. Take the case of trespasses upon land where the elements entitling to equitable relief exist. See *Slater v. Gunn,* 170 Massachusetts 509, and cases cited. It may not be doubted that the authority of a court would extend, not only to restraining a particular imminent trespass, but also to prohibiting like acts for all future time. The power exerted by the court below which is complained of was in no wise different. The bill averred the custom of the complainant at frequently occuring periods to issue reduced rate nontransferable tickets for fairs, conventions, etc., charged a course of illegal dealing in such nontransferable tickets by the defendants, and sought to protect its right to issue such tickets by preventing unlawful dealings in them. The defendants in effect not only admitted the unlawful course of dealing as to particular tickets then outstanding, but expressly avowed that they possessed the right, and that it was their intention to carry on the business as to all future issues of a similar character of tickets. The action of the circuit court of appeals, therefore, in causing the injunction to apply not only to the illegal dealings as to the then outstanding tickets, but to like dealings as to similar tickets which might be issued in the future, was but the exertion by the court of its power to restrain the continued commission against the rights of the complainant in the future of a definite character of acts adjudged to be wrongful. Indeed, in view of the state of the record, the inadequacy of the relief afforded by the decree as entered in the circuit court is, we think, manifest on its face. The necessary predicate of the decree was the illegal nature of the dealings by the defendants in the outstanding tickets, and the fact that such dealings, if allowed, would seriously

impair the right of the complainant in the future to issue the tickets. Doubtless, for this reason the decree was made without prejudice to the rights of the complainant to apply for relief as to future issues of tickets by independent proceedings whenever on other occasions it was determined to issue nontransferable tickets. But this was to deny adequate relief, since it subjected the complainant to the necessity, as a preliminary to the exercise of the right to issue tickets, to begin a new suit with the object of restraining the defendants from the commission in the future of acts identical with those which the court had already adjudged to be wrongful and violative of the rights of the complainant.

In *Scott v. Donald,* 165 U. S. 107, on holding a particular seizure of liquor under the South Carolina dispensary law to be invalid, an injunction was sustained not only addressed to the seizure in controversy but also operated to restrain like seizures of liquor in the future, and the exertion of the same character of power by a court of equity was upheld in the cases of *Donovan v. Pennsylvania Company,* 199 U. S. 279, and *Swift v. United States,* 196 U. S. 375."

It is not only plainly established by the evidence that a direct pecuniary loss is inflicted upon the carrier by the wrongful dealings of brokers in these nontransferable tickets, but in addition to this loss it appears that the carrier's business in general is thereby seriously cripple and interfered with; and it is manifest that the railroad company is without an adequate remedy at law for such violation of its ticket contracts, and the resultant harmful interference with its business, for to bring a separate suit for damages in case of each ticket sold would involve a multiplicity of suits, excessively burdensome and expensive, and unlikely, in any event, to afford substantial relief to the carrier. It is simply a case of frequently recurring wrong call-

ing for equitable relief as the only adequate means of protecting the railroad company in the conduct of its legitimate business. So that, for the damages and injuries sustained, if there is no remedy in equity, there is none at all in any just and proper sense. To so conclude would be a sad reflection upon the power of courts, under the law, to protect against wrong where wrong clearly appears, or to afford relief where it is plainly due.

It is contended, because of alleged former connivance by the railroad companies with the defendants in the matter of trafficking in nontransferable tickets, the brokers have been induced to spend large sums of money in fitting up their offices, in securing thereon leases for the future, in the purchase of great numbers of this class of tickets, at a vast outlay of money, and that the railroad companies ought not to be heard in equity to complain of such transactions now. These matters are pleaded at length in the answer and are put in issue by the replication.

To this point it is said in the brief of the defendants:

"Connivance means tacitly permitting or indirectly aiding a thing; as, when one by collusion witholds condemnation or exposure, or when he actually or impliedly lends encouragement to another in the commission of an act. Connivance is not in law a perpetual estoppel. That the railroads for a considerable length of time prior to the bringing of these suits had ceased to connive with the ticket brokers, were it a fact, would permit them to avoid the legal effect of prior connivance and would enable them to bring an action to enjoin an evil custom to which they had formerly lent their encouragement. The doctrine of connivance is, therefore, no perpetual bar. Proof, however, of connivance continued up to the filing of a complaint, or

shortly prior thereto; must defeat the action. It is a question of proof."

Upon the record before us, this admission practically disposes of the contention of counsel on this proposition. The question of estoppel by connivance is one strictly of fact. We search the evidence in vain for a syllable of testimony from any source, which, upon any theory, can fairly be said to even purport to uphold or support the claim that the plaintiff company, so far as the present situation, or any matter involved in this particular controversy, is concerned, by its conduct, in any way, encouraged the defendants, or connived with them, in their lawful business of trafficking in nontransferable tickets, or the unused portions thereof.

There is nothing in the record to show that the defendants, or any or either of them, have spent a single dollar in maintaining or equipping their offices; or that they have any lease or leases upon their respective places of business, good for the present or future; or that they have on hand railroad tickets of any kind, sort or character at all, nontransferable or otherwise; or that they then had any investment whatever in railroad transportation. Upon all of these matters there is a total lack of evidence. This being so, it would be a waste of time to discuss the question whether the plaintiff company on former occasions, in connection with other ticket contracts, sold tickets to these defendants, for if it did, such conduct could have no application to subsequent and independent transactions, which related solely to the present and future conduct of the defendants, because, as has been well said by the defendants' counsel, "The doctrine of connivance is not a perpetual bar."

The law is that every time one of these defendants dealt in an illegal way in nontransferable tickets, it committed a new and independent wrong against

the railroad company, distinct and separate from all former transactions. Every time a defendant interfered with a purchaser of a nontransferable ticket in the performance of his contract with the railroad company, a new wrong and injury was committed against that company, for which it has legal ground of complaint. The question, therefore, is, for what wrong does the plaintiff in this case seek redress? Is it for a past, present or anticipated future wrong? If for a present or contemplated future wrong, it is immaterial whether the plaintiff connived at or acquiesced in past wrongful acts of the defendants, even though they may have been of the same general character as those for which redress is now sought.

In this connection counsel seek to apply the maxim that "He who comes into equity must do equity." To show its inapplicability here, and to show that the inequity which bars the plaintiff must have been in connection with the particular act or acts of the defendants against which remedy is sought, we quote the following authorities:

In *John Ainsfield Co. v. Crossman*, 98 Ill. App. 180, at page 186, the court says:

"The maxim of equity that he who seeks equity must come with clean hands, only applies to the particular transaction under consideration by the court.

'The wrong must have been done to the defendant himself, and must have been in regard to the matter in litigation.' "

In *Liverpool, etc., Bo. v. Clune*, 88 Fed. 160, it was held, at page 170, that:

"The maxim that he who comes into equity must come with clean hands has its limitations. It does not apply to every unconscientious act or inequitable conduct on the part of the complainants. The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct uncon-

nected with the act of the defendant which the com-
plaining party states as his ground or cause of action,
but it must be evil practice or wrong conduct in the
particular matter or transaction in respect to which
judicial protection or redress is sought."

In *Woodward v. Woodward,* 41 N. J. Eq. 224, at
page 225, the vice-chancellor says:

"The iniquity which deprives a suitor of a right
to justice in a court of equity, is not general iniquitous
conduct, unconnected with the act of the defendant
which the complaining party states as his ground or
cause of action, but it must be evil practice or wrong-
ful conduct in the particular matter or transaction in
respect to which judicial protection or redress is
sought."

In *Shaver v. Heller & Merz Co.,* 108 Fed. 821, at
page 834, the court said:

"The principle 'that he who comes into equity
must do so with clean hands' is familiar and indis-
putable. But it does not repel all sinners from courts
of equity, nor does it disqualify any complainant from
obtaining relief there, who has not dealt unjustly in
the very transaction concerning which he complains."

In *Kinner et al. v. L. S. & M. S. Ry. Co.,* 69 Ohio
St., 339, at page 345, the court said:

"The numerous cases cited in the briefs show that
in the application of the maxim urged by counsel for
the plaintiffs in error, the courts have consistently
granted or refused relief by determining whether the
reprehensible conduct of the plaintiff is related to the
subject of the suit. In the present case the railway
company did not count upon the illegal contract, nor
did it, in any manner, ask the court to approve the
validity of that contract. The tickets against whose
fraudulent use the injunction was granted were issued
by the company in the usual course of the business
for which it was organized; the stipulations against

their transfer rested upon the consideration of a re-
duction of the rates of carriage; they contained no
stipulation contrary to any statute either of the United
States or of the state of Ohio, or in contravention of
public policy, nor was there anything in the conduct of
the company by which any right of the original de-
fendants was prejudiced."

The main transactions which the brokers claim to
have had with the railroad companies, in connection
with nontransferable tickets, were with subordinate
employees, not shown to have been specifically au-
thorized to so act, and they occurred for the most part
long prior to the commencement of this action. The
testimony relating to more recent transactions is to
the effect that nontransferable or mileage tickets were
purchased by the brokers of certain of the companies
in the usual way, at the regular price, and upon com-
pliance with the conditions required of other pur-
chasers of such transportation. Those sales appear to
have been made in good faith and to supply *bona fide*
customers of the brokers. It does not appear that the
defendants were or could have been deceived or mis-
led by these transactions, or in any wise disadvan-
taged. The evidence shows that the last of these trans-
actions occurred some months previous to the filing
of this suit.

Closely akin to the matter just discussed is that
of estoppel by laches and acquiescence, also relied upon
in defense.

The theory of counsel on this branch of the case
seems to be, that because the railroad companies have
not earlier attempted to end the evil complained of
they are estopped by laches to do so now; that be-
cause they have, with such patience as they could
summon, permitted themselves to be thus imposed upon
and defrauded in the past, therefore they must con-
tinue to do so for all time to come; in other words,

because the defendants have heretofore carried on an illegitimate calling by fraudulent means, without prevention by the companies injured and wronged thereby, that they have therefore acquired a vested or prescriptive right to continue to carry on such unlawful calling by similar fraudulent means, and that the railroad companies, by delay in action, have sinned away their right to ever prevent it.   No more completely unsupported and startling doctrine could well be submitted for the consideration of a court of equity.·

The very foundation of equitable jurisdiction in a case such as the one at bar lies in the repeated infringement on contracts between the railroad companies and the original purchasers of their nontransferable tickets, and in the fact that the defendants have made a business of aiding and abetting in such infringement and purpose to make a business of doing so in the future.—*Schubach v. McDonald, supra; Syracuse Solar Salt Co. v. Home W. & O. R. Co.,* 22 N. Y. Sup. 321; *Corning v. Troy Factory,* 40 N. Y. 205; *Galway v. M. E. R. Co.,* 128 N. Y. 132; and *Hennesy v. Carmony,* 50 N. J. Eq. 616.

The repeated trespasses of these defendants upon the property right of the railroad companies, to conduct a lawful business in a lawful way, by entering into nontransferable ticket contracts with passengers, is not dissimilar from repeated or continued trespasses upon real estate.   The right of the owner of real estate to injunctive relief against such repeated or continuous trespasses is not defeated by any lapse of time, however great, until title by adverse possession under the statute has passed to the defendant.   Beach on Injunctions, Secs. 1145-1146.

That the plaintiff railroad companies have a strict legal right which they are trying to protect by these proceedings is settled beyond question.   That the defendant ticket brokers have wholly failed to prove

any facts amounting to an equitable estoppel is equally beyond question. They have neither shown, nor attempted to show, that their course of dealing has been changed by any act of the railroad companies. No facts are established to indicate that they have been misled in the slightest degree; on the contrary, it appears that they have always acted with full knowledge, equal in all respects to that of the companies, and upon full notice. No facts are proven to show that they have been deceived in any way, or induced to alter their position, by anything which the railroad companies have done or failed to do. The element of good faith on the part of the brokers is utterly lacking. All of these matters are essential to uphold and support the plea of equitable estoppel. Without them there is no estoppel. The rule is that in order to constitute an estoppel by conduct, all the essential elements of such an estoppel must be present. Bigelow on Estoppel, pp. 431, 437, 492; 1 Story's Equity Jurisprudence, Sec. 191; 2 Story's Equity Jurisprudence, Sec. 543; *People v. Brown et al.,* 57 Ill, 437; *Martin v. Zellerbach,* 38 Cal. 315; *Patterson v. Hitchcock,* 3 Colo. 353; and *Griffith v. Wright,* 6 Colo. 248.

The doctrine endeavored to be relied upon by the brokers is one which can never be made available, except in defense of a legal or equitable right or claim made in good faith, junior in point of time, against which an older right ought not to be heard to assert itself. The doctrine can never be asserted to defend or uphold crime, fraud or misdoing of any character. One reason for this is that under such circumstances the element of good faith is lacking that being absolutely essential when one relies on such plea.

That the fraudulent acts of the brokers in the past have never been done under any claim of right is conclusively shown by the fact that they have always been done clandestinely, under attempts at conceal-

ment, and by the use of fraudulent methods intended to deceive the railroad companies and their agents. As example of these methods, attention is called to the undisputed evidence regarding the forging of tickets, the use of assumed and fictitious names, the impersonation of the original purchaser of the non-transferable ticket, and the imitation of his signature, and other like practices; all of which demonstrate beyond question not only the fraudulent character of the broker's business, but also a knowledge by them that they are without a vestige of right, upon any theory, because of connivance or acquiescence by the companies or otherwise, to thus violate the express terms of a contract between the railroads and their passengers. Whatever place the doctrine of estoppel by connivance, laches and acquiescence may have in equity jurisprudence generally, relative to injunctive relief, clearly it is inapplicable to the case at bar, where the defendants are shown to have deliberately and knowingly, for a long period of years, engaged in an unlawful business. When they thus knowingly and voluntarily engaged in these illegal transactions it was for the purpose of defrauding the transportation companies, in the expectation and hope of illegitimate gain, and in so doing they acted at their peril. They took every chance of loss and disaster naturally involved in such conduct, and are not in position to invoke the doctrine of equitable estoppel.—*Menendez v. Holt*, 128 U. S. 514; *Galway v. M. E. R. Co., supra; McIntire v. Pryor*, 173 U. S. 38; *Saxlehner v. Eisner & M. Co.*, 179 U. S. 19; *Tracey v. Banker*, 170 Mass. 266; and *Rigney v. Tacoma L. & W. Co.*, 9 Wash. 590.

In *Tracey v. Banker, supra,* Judge Holmes, now a justice of the United States Supreme Court, said:

"The defendant has the boldness to urge that, because he began his attempt to defraud the union in 1894, before the act of 1895 was passed, after having

been permitted on his application to use the label for a time, therefore the plaintiff's union has no rights under the statute. We do not think the suggestion needs more than a statement: The plaintiff has lost no rights through laches."

In *Galway v. M. E. R. Co., supra,* a leading case upon this subject, the court says:

"Inasmuch as the equitable remedy depends, among other things, upon the existence of a legal cause of action, it follows that those facts which will bar the legal action will also afford an answer to the equitable remedy, and that so long as a legal remedy exists an equity court is open to aid in the enforcement of the legal claim.

When the trespass is of such a character that it may be discontinued at the option of the wrong-doer, or, if continued, is susceptible of having legal sanction obtained for its continuance, it seems offensive to our sense of right that a wrong-doer should be permitted to allege that his intention to repeat and continue his own unlawful conduct should deprive the owner of any of the remedies which the law has provided for his protection If it were otherwise the wrong-doer would be permitted to show the aggravated, character of his own conduct as a defense to the action of the legal owner and thus violate the rule of law, as well as the plainest principles of equity. * * *

The lapse, therefore, of six years after a trespass has been committed upon real estate, bars not only the legal but also constitutes a practical defense to an equitable action founded upon the necessity of numerous legal actions to obtain redress, because the right to such redress has as to such wrongs expired. But, if the trespasses are continued after that period, new causes of action arise, unbarred by any rule of law or equity, which are cognizable not only at law but also in equity. * * * *

The doctrine of acquiescence as a defense to an equity action has been generally limited here to those of an equitable nature exclusively, or to cases where the legal right has expired, or the party has lost his right of property by prescription or adverse possession. * * * The principle that so long as the legal right exists the owner is entitled to maintain his action in equity to restrain violations of this right, has been uniformly applied in this court. * *. * *

Even in cases where laches have been allowed to operate as a defense the question is to be determined in the discretion of the court upon all of the circumstances of the case. * * * *

What might be considered an unjustifiable delay in one case would be considered reasonable in another, and an equity court which should refuse its aid to a party in protecting a legal right without a valid and sufficient reason, would be subject to the criticism of shutting the doors of the temple of justice in the face of meritorious suitors and condemning them to suffer remediless wrongs."

In *Menendez v. Holt, supra,* the Supreme Court of the United States, speaking through Chief Justice Fuller, says on page 523:

"The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent; and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees

upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder, *Attorney General v. Eastlake,* 11 Hare, 205; nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right. *Fullwood v. Fullwood,* 9 Ch. D. 176. Acquiescence to avail must be such as to create a new right in the defendant. *Rodgers v. Nowill,* 3 De G., M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' Duer, J., *Amoskeag Mfg. Co. v. Spear,* 2 Sandford (N. Y.) 599; *Julian v. Hoosier Drill Co.,* 78 Indiana, 408; *Taylor v. Carpenter,* 3 Story, 458, S. C. 2 Woodb. & Min. 1.

So far as the act complained of is completed, acquiescence may defeat the remedy on the principle applicable when action is taken on the strength of encouragement to do it, but so far as the act is in progress and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise."

Furthermore, the doctrine of laches only applies to property rights created in the past, and may not be made to apply to other and distinct trespasses in contemplation for the future. As was said by Chief Justice Fuller, in *Menendez v. Holt, supra:*

"Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder.".

(The fundamental error in the contention of the defendants upon the question of laches and acquiescence lies in the failure to recognize that each time a broker interfered with one of the nontransferable ticket contracts, he committed a new and distinct wrong against the railroad company, for which a right of action at once accrued. The fact that the railroad company has failed to seek redress for numerous past wrongs clearly may not be urged as a defense against an action seeking relief from an entirely independent and recent wrong, or to an action which seeks protection by injunction against an anticipated future injury.

The cases cited by counsel for the defendants upon the subject of laches go to single distinct acts acquiesced in, where relief against that particular act was denied owing to plaintiff's delay, but such decisions clearly have no application to the present controversy. The doctrine of laches or acquiescence in equity is, in many respects, similar or analagous in its application to the ordinary statute of limitations at law. It will not be seriously contended that because a plaintiff has allowed the statutory limitation period to lapse in a suit upon one cause of action, without pleading and relying upon it, that a defendant could set that fact up as a defense to a suit on another cause of action between the same parties, which had more recently accrued. Such a situation is not unlike the one here presented. That the two causes of action may have grown out of a similar state of facts would in no sense make them identical, or in any way change the rule of law relative to the right of the plaintiff to maintain the action against the plea of estoppel. Each cause is as distinct from the other as it would be if based upon a totally dissimilar state of facts. It seems almost axiomatic to say that the delay which bars the door of equity to a litigant must be delay in

respect to the precise right which he is then seeking to enforce or protect.

Moreover, as to whether connivance, acquiscence or laches shall affect the issuance of an injunction rests in the sound discretion of the chancellor to whom the application is made, and it is to be determined upon a full consideration of every fact adduced bearing upon that question. In this case the trial judge, upon the proofs, found that issue against the defendants, and clearly the present record presents no ground upon which this court could possibly feel disposed to inter- fere with or disturb such finding.

That portion of section 25a, subdivision of and amendment to section 25, of the Code of Civil Procedure, upon the provisions of which the defend- ants relied for a change of venue, reads:

"All actions affecting property, franchises or utilities, whether by foreclosures, appointment of re- ceivers, or otherwise, shall be tried in the county where such property, franchise or utility is situated, or in the county where the greater part thereof is situated."

Section 27 of the Code of Civil Procedure provides in part:

"In all other cases the actions shall be tried in the county in which the defendants, or any of them may reside at the commencement of the action."

Separate like motions to change the venue, each supported by a proper affidavit, were filed by two of the defendants, under subdivision 25a above quoted. The material part of each motion follows:

"That the said action affects property, to-wit, the ownership of certain alleged nontransferable railroad tickets issued and to be issued by the plaintiff herein, and that the greater part of said property or railroad tickets already issued now are and at the time of the bringing of said actions were situated in the said City and County of Denver, and were held in the possession,

custody and control of brokers, defendants herein, resident in the City and County of Denver, and not in the said City of Pueblo."

It will be observed that this motion is based solely upon subdivision 25a, and unless it affords grounds for a change of venue of an action like this the cause was properly retained in Pueblo county.

Section 25 and subdivision 25a thereof have reference exclusively to actions *in rem*, where specific property is to be directly affected. This action is distinctively an action *in personam*, and is transitory in its character. In concluding what provision of the code governs the venue of this action it is necessary first to consider and determine its nature and purpose. What is the character of the suit, and what is its object? It is strictly a suit in equity to protect, by injunction, the property right of the defendant company to do a lawful business in a particular way; such is its only purpose; nothing more, nothing less. It is not sought to affect or obtain relief against specific property. The decree operates against the defendants *in personam*. It simply restrains them from continuing to do certain unlawful acts, the doing of which wrongfully interferes with and hinders the plaintiff in carrying on, in a perfectly proper and legitimate way, its lawful business of issuing and dealing in nontransferable signature tickets; such is the prayer of the complaint and such is the relief given. It is in no sense an action upon the tickets, either for their recovery or for damage resulting to the company for an unlawful traffic in them. The thing affected is a property or business right of the lightest possible value to plaintiff, which is as much entitled to protection as any other species of property, real or personal. This being so, it follows irresistibly that the venue of this suit is in no way controlled by subdivision 25a of the Civil Code, but by section 27 thereof.

*Railroad Company v. McConnel, supra,* was in all respects a case like this, based upon similar facts and having the same purpose in view. The decision there is conclusive upon the question as to what is involved in this class of cases. We quote from the opinion to this point as follows:

"The question, as fairly presented in these bills, is that of the protection of the business of the complainants being carried on during this Exposition in aid thereof, and in the form of these Exposition tickets. The wrong of which the complainants are complaining is not limited to the proposition that any particular one or more of these tickets has been violated, giving rise thereby to legal liability. The position here is that the business of the complainants is being seriously damaged, and will continue to be during the perior of this Exposition. The loss, it is alleged, is being suffered by these complainants by repeated and continued purchases and use by these defendants of these tickets, and the question involves the entire loss which the complainants may sustain by the fraudulent use of such tickets from the beginning to the end of the Exposition. It is the protection of the whole of this form of business from the entire loss already sustained, and likely to be sustained between now and the end of the Exposition period. I repeat that it is not a question of enforcing a contract, or of recovery of damages for a breach, but it is protection of the business of the complainants from loss suffered and to be suffered by the frauds committed and· likely to be committed against these companies by means of, and through the instrumentality of, these void tickets, and it is in these broader limits that the question is here considered.  *  *  *  *

The contention is that these bills are substantially suits upon the ticket contracts, to recover damages for a violation thereof, or for specific execution

thereof.   *   *   *   From what has been said, it will
readily be seen that in my opinion these are in no
just sense suits upon the contract, nor for specific
performance, but are suits to protect the business of
the complainants against the irreparable mischief be-
ing suffered by reason of the fraudulent use and abuse
of these ticket contracts.   *   *   *   Plaintiffs' busi-
ness is the subject-matter in each bill, and the right
claimed is exactly the same against all the defendants.
The injury complained of is the same, and is being
inflicted by defendants in the same method and at
the same time.   *   *   *   *

The case simply calls for an application of the
injunctive process to prevent complainants' business
from fraud and obstruction, and a business is just as
much the subject of suit, with a right to protection,
as ordinary forms of tangible real and personal prop-
erty.   Whatever doubt may have been expressed at any
time, the cases are now agreed upon this proposition.
It needs no extended statement to make it manifest
that the right to carry on a business without inter-
ference, without fraud, and without obstruction, is
one of the most valuable of all rights.   Indeed, in the
commercial world the right of greatest value is the
right to freely carry on a lawful business without
unlawful interruption.   It is a substantial right, which
may be protected by any remedy known to the court
as fully as a constitutional or statutory right, and
as fully as a right in the ordinary forms of property.
*   *   *   *.

It is sufficient to repeat what has already been
said, to-wit, that these are suits to protect the plaint-
iffs' business, and in no sense suits upon these ticket
contracts, to enforce the same, or to recover damages
for breach thereof.   These suits are to restrain these
defendants from the continued and repeated use of
these contracts as instruments and means whereby to

commit frauds upon complainants' business. They are not suits between the parties to these contracts, but against third parties, to restrain the fraudulent use of the contracts as means of committing such wrong."

The tickets referred to are not the subject of the suit; they are merely incidental, and are material only as being the means and instruments by which the unlawful and malicious interference of the defendants is made effective. It is too plain to need further discussion that the property affected by the present action was and is the property right of the plaintiff company and the other railroad companies to carry on their lawful business by issuing and selling nontransferable tickets at reduced rates, without unlawful and wrongful interference by the defendant brokers.

But if the position assumed as to the object of the suit is incorrect, still railroad tickets do not have the characteristics of property as that term is used in subdivision 25a of the code. At most a railroad ticket is mere evidence of a contract. By the great weight of authority, where the exact character of a railroad ticket is discriminately considered and exactly defined, it is held that it does not even rise to the dignity of the evidence of a contract, but is a mere token to show that the person properly in possession of it has paid his fare between the stations named in the ticket.

In 4 *Elliott on Railroads,* Sec. 1593, it is said:

"According to the generally accepted doctrine a ticket, in the ordinary form, is a voucher, token or receipt, rather than a contract, adopted for convenience, to show that a passenger has paid his fare from the place or station named therein as the place of departure to the place or station named therein as the place of destination. Fare is 'the price of passage or the sum paid or to be paid for carrying the passenger'. A ticket is evidence of a contract to carry and

the right to passage, but the contract itself is implied by law except in so far as it is expressed in the ticket. * * * A railroad ticket is not negotiable as commercial paper, although it may be transferable unless otherwise provided, and a person who purchases a ticket in good faith and for a valuable consideration from one who has stolen or fraudulently obtained. it from the company does not thereby acquire a good title."

In *Quimby v. Vanderbilt*, 17 N. Y. 306, at page 313, the court, speaking of railroad tickets, said:

"The tickets do not purport to be contracts. They are rather in the nature of receipts for the separate portions of the passage money; and their office is to serve as token to enable the persons having charge of the vessels and carriages of the companies to recognize the bearers as parties who were entitled to be received on board."

In *People v. Warden*, 157 N. Y. 116, at page 146, Judge Martin said:

"A ticket is a mere incident to the business of the companies in transporting passengers. Like a baggage check, it is merely a method adopted by them for the transaction of their own business. The ticket itself possesses none of the ordinary elements of property and cannot, without the consent of the companies, form the basis of a legitimate independent business. At most it is but an evidenc of the arrangement between the companies and their passengers in which others have no lawful interest. No right to transfer is given, and, generally, none is intended."

While this is from a dissenting opinion, there was no division in the court on this particular point.

In *Jannin v. State, supra,* the Texas court said:

"The ticket of a railroad company is not property in the general acceptation of the term, but the pur-

chaser has only a special property in the ticket as evidencing his right to passage on the road."

In *Hibbard v. N. Y. & E. R. R. Co.*, 15 N. Y. 455, at page 466, it is said:

"The ticket is the property of the railroad company, and is a part of the means by which it conducts its business. It is delivered to the passenger to be held by him, temporarily, for a special purpose, and who, to that extent, acquires a special property in it. When the journey is ended, or about to end, it is to be redelivered to the conductor. It serves a threefold purpose: it is evidence in the passenger's hands that he has paid his fare and has a right within the cars; it insures the payment of the passage money by all who take seats, and when it is redelivered to the company it becomes a voucher in its hands, against the officer or agent who issued it, in the adjustment of its accounts."

In *Levinson v. Texas & N. O. Ry. Co.*, 43 S. W. 1032, (Texas), a case in which a nontransferable ticket had, after passing through broker's hands, come into plaintiff's hands, in a suit for conversion, the court said:

"By reason of its very terms, it (the ticket) had, upon being transferred, ceased to be property, was void and subject to be taken up; consequently plaintiffs, as holders of such ticket, had no rights in respect thereto, and cannot be allowed damages from defendant for taking it up and retaining it."

Moreover, it clearly appears that the original purchaser of these tickets took them subject to express agreements and limitations, and that no power to dispose of or transfer them existed. This right being wanting, the tickets, in the hands of third persons, lacked one of the essentials of the right of property, namely, the power of sale and transfer, and therefore, in no event, could they be property in the hands of

such holders. *Jannin v. State, supra;* and *Schubach v. McDonald, supra.* In the hands of the defendants these tickets are merely evidence of contracts between the railroad company and third persons, in which the defendants have no possible interest or property right. Not a single ticket in their possession has any legal value; on the contrary, they are void in the hands of any third person. The property right of the defendants in such tickets is precisely of the character of the property right which one acquires in counterfeit money, purchased for a nominal sum with a view of passing it as true and genuine. The tickets have no more the essential elements of property in the hands of a third person than that kind of currency would have.

Furthermore, it appears from the record that the complaint was filed September 7th, 1905; that on the 11th of that month the defendants entered a general appearance and filed their answer to the merits upon the order to show cause; and that the same was then fully argued, submitted to the court and taken under advisement. Not until afterward and on the 18th of that month was the motion to change the venue filed. The answers of the 11th day of the month went fully into the merits of the controversy. No intimation was then given that defendants would apply for a change of venue.

The right to have the place of trial changed because the action is brought in an improper county is not jurisdictional, but a mere personal privilege, which may be waived, and is waived, by a general appearance and pleading to the merits. It is also waived unless the motion is interposed at the earliest possible moment. Such a motion must be made as soon as the moving party acquires knowledge of the facts upon which the motion is based. It is manifest that this knowledge came to the moving party in this case as

soon as the complaint was served. We are clearly of the opinion that the motion to change the venue came too late.—*Denver S. P. & P. R. R. Co. v. Roberts,* 6 Colo. 333; *School District v. Waters,* 20 Colo. App. 106; *Fletcher v. Stowell,* 17 Colo. 94; *Commissioners v. Commissioners,* 2 Colo. App. 412; *Wasson v. Hoffman,* 4 Colo. App. 491; *D. & R. G. R. R. Co. v. Cahill,* 8 Colo. App. 158; *Forbes v. Commissioners,* 23 Colo. 344; *Boyle v. People,* 4 Colo. 176; *Roberts v. People,* 9 Colo. 452; *Bean v. Gregg,* 7 Colo. 499; *Smith v. Morrill,* 12 Colo. App. 233; and *Burton v. Graham,* 38 Colo. 199.

In *School District v. Waters, supra,* it was said:

" 'It may be stated as a general rule that the bringing of an action in an improper county is not a jurisdictional defect, where the court has general jurisdiction of the subject-matter, and that the statutes fixing the venue in certain actions confer a mere personal privilege, which may be waived by a failure to claim it in the proper manner and at the proper time.' " (Citing 22 Enc. P. & P. 815 and cases cited.)

Upon the plea that the plaintiff company, because of its failure to pay the state license tax, as provided for by the statute of 1902, ought not to be permitted to maintain this action, it is sufficient to say that since the decision by the court below in this case the Supreme Court of the United States, in *American S. & R. Co. v. State of Colorado, ex rel. Lindsley,* reported in 204 U. S. 103, has held that law void, so far as it relates to a foreign corporation which had already paid the entrance tax and received permission to do business in this state, on the same basis of restrictions and liabilities as domestic corporations, and therefore this plea was not and is not available to defendants as against the plaintiff, a corporation organized under the laws of the state of Utah, which had thus complied with all of the requirements of the then exisiting laws of Colorado, entitling it to those privileges.

In support of the proposition that the court below erred in issuing the temporary restraining order without notice, and in failing to dismiss the complaint upon the ground that no emergency existed, the defense relied upon the code provision of the Session Laws of 1903, as follows:

"That if complainant shall file an affidavit by himself or his representative and by not less than two other persons, showing that irreparable mischief or injury will result to him, if notice be given, and the complainant shall, further, make affidavit (1) that such alleged emergency is not the result of his creation or connivance, and (2) that his application is made at the earliest time that he could have made it, after learning of the facts, the court or judge shall have power to grant a temporary restraining order."

That particular provision for the dismissal of the action, in case the showing called for by the foregoing was insufficient, reads thus:

"That in the event the temporary restraining order shall issue without notice and it shall afterwards appear to the court, upon any hearing or trial of said matter, that the emergency alleged therefor did not exist, or, existing, was brought about by the act or omission of or for the plaintiff, or by his knowledge, the court shall find and enter judgment accordingly, and shall, also, dismiss the complaint without respect to the merits thereof, and shall, also, summarily enter judgment on said emergency bond for the defendant and against the plaintiff and his sureties aforesaid, and issue execution therefor."

The record fails to show that the court was requested to rule upon these matters. No motion to dismiss was interposed; neither was judgment moved on the emergency bond. So that, upon these propositions, the court was not requested to act, and it would be a

gross injustice to permit the defendants to now avail themselves of any alleged error in these respects.

Moreover, the questions as to whether such emergency did exist and whether it was brought about by the connivance of the plaintiff, are ones of fact, and must of necessity have been determined, upon the whole record, adversely to the defendants, as the statutory emergency contemplated was fully shown by explicit direct affidavits as required by statute. From these it appears that irreparable mischief or injury would result to the plaintiff if notice were given, because great delay would thereby be involved, as the defendants, residing in different cities of the state, could not be readily reached, and while such notice was being served they would continue to commit the acts complained of and would, as had been done under similar circumstances in like cases, assign their business to others, not parties to the suit, and would dispose of the tickets acquired by them to third persons, many of them beyond the jurisdiction of the court. The affidavits further expressly show that the emergency was not the result of plaintiff's connivance. No attempt was made to controvert the showing on these propositions. There was, therefore, no error upon these supposed grounds, and even if there had been, the defendants not having urged these matters in the court below are not in position here and now for the first time to complain of them.

It is to be carefully kept in mind that so far as the defendant brokers carry on a legitimate business, they are not and cannot be affected by this decree at all. It is not intended to affect their lawful dealings. But so far as they have carried on, and seek to carry on, a business in these special contract tickets, it is an illegitimate and improper business and ought to be stopped. It is fraud, not only upon the railroad companies, but upon the traveling public as

well.  If the railroad companies are permitted to carry on their rightful business in these special contract tickets, without wrongful interference and malicious molestation by the brokers, the result will be to greatly benefit the traveling public; these reduced-rate tickets will then doubtless be issued more frequently than they now are, probably at better rates, and certainly with many less limitations and annoying requirements.

Perceiving no error in the record, the judgment is in all respects affirmed.

*Judgment affirmed.*

Decision *en banc.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE WHITE not participating.